IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAY 2 8 2019

CLERK, U.S. DISTRICT COURT
By_____
            Deputy

AMBULATORY SERVICES OF PUERTO       §
RICO, LLC, ON ITS BEHALF AND        §
DERIVATIVELY ON BEHALF OF           §
SNG NARANJITO, LLC, ET AL.,         §
                                    §
          Plaintiffs,               §
                                    §
VS.                                 §    NO. 4:18-CV-916-A
                                    §
SANKAR NEPHROLOGY GROUP, LLC,       §
ET AL.,                             §
                                    §
          Defendants.               §

MEMORANDUM OPINION
and
ORDER

Before the court for consideration and decision is the

motion of plaintiffs, Carlos R. Rivera ("Rivera"), Ambulatory

Services of Puerto Rico, LLC ("ASPR"), and SNG Naranjito, LLC

("Naranjito") (collectively "plaintiffs"), to disqualify counsel

for defendants Sankar Nephrology Group, LLC ("SNG"), Renal

Physicians of North Texas LLC ("Renal Physicians"), and PPG

Health P.A. ("PPG") from representing any of the defendants in

this action. The court has concluded that it should withhold a

ruling on plaintiffs' motion, as well as the pending motions to

dismiss, until after the hearing now scheduled for June 12, 2019,

has been conducted.

I.

## Nature of Plaintiffs' Claims

Once the underbrush is cleared away, the heart of plaintiffs' main complaints are that SNG, at the behest of defendants Ponniah S. Sankarapandian, a/k/a Ponniah Sankar ("Ponniah Sankar"), and Balamurugan P. Sankarapandian, a/k/a Bala Sankar ("Bala Sankar") (collectively, "the Sankars"), (1) secretly and fraudulently borrowed against Naranjito's assets $3,700,000 for the purchase from Rivera of a sixty percent interest in Naranjito and (2) caused the mishandling and misappropriation of $7 million realized from the sale of Naranjito's assets to Fresenius Medical Care ("Fresenius") in February 2016.[1] At the time of the sale, Naranjito was jointly owned by ASPR and SNG. The second of those two complaints received the most attention in the allegations of the amended complaint.

The first of the two, which is the basis of Count I of the complaint, arises from a transaction in early 2014 when ASPR, acting through Rivera, and SNG, acting through the Sankars, entered into an arrangement for joint ownership of Naranjito. In connection with that transaction ASPR and SNG executed a

---

[1] The offer to purchase the assets of Naranjito for $7 million was actually made by Bio-Medical Application of Puerto Rico, Inc., which was a part of an international conglomerate operating under the name "Fresenius Medical Care," doc. 32 at 25, ¶ 100; however, the actual agreement to sell the assets of Naranjito was entered into with Fresenius Medical Care, id., ¶¶ 100-01.

2

Membership Contribution Agreement ("MCA") that prohibited future financing or the encumbrance of Naranjito's assets without joint approval of ASPR and SNG. Plaintiffs alleged that SNG violated the MCA by encumbering assets of Naranjito to obtain funds to use for funding of SNG's purchase of an interest in Naranjito, in a way that did not benefit ASPR but, instead, caused ASPR to suffer damages. This alleged violation forms the basis of Count I of the complaint. Doc. 36 at 39, ¶¶ 170 & 171.[2]

Another agreement ASPR and SNG entered into when Naranjito was formed was a Limited Liability Operating Agreement for Naranjito (the "Operating Agreement"). Count II complains that the Sankars and SNG breached the Operating Agreement in a number of respects, including causing an inappropriate distribution for the benefit of SNG and the Sankars of the funds realized from defendant Branch Banking and Trust Company ("BB&T") of the $3,700,000 loan they obtained from BB&T to fund SNG's purchase of an interest in Naranjito in violation of the Operating Agreement as well as in violation of the MCA. Id. at 39-41, ¶¶ 175-178.

Interwoven into other Counts of the amended complaint are further complaints about the $3,700,000 loan and the disposition of the $7 million received from the sale of Naranjito's assets.

---

[2]The "Doc. ___" references are to the numbers assigned to the referenced items on the docket in this Case No. 4:18-CV-916-A.

Count III is based on a claim of breach by SNG of an agreement SNG and ASPR executed for the sale of the assets of Naranjito to Fresenius (the "Member Sale Agreement" or "MSA"). The MSA set forth the understanding of the parties relative to disposition of the sale proceeds from the sale of Naranjito to Fresenius. According to plaintiffs, ASPR was to receive no less than $2,800,000 from that sale and, in addition, was entitled to forty percent of the $76,000 received for Naranjito's inventory. SNG allegedly violated the Member Sale Agreement by preventing payment to ASPR of its share of the proceeds, causing the purchaser, instead, to pay the proceeds to BB&T, rendering the proceeds inaccessible to ASPR. In the process, SNG failed to pay ASPR its forty percent share of the sale's proceeds.

Count IV alleged breach of fiduciary duty against the Sankars and SNG based on the conduct of SNG and the Sankars in obtaining the $3,700,000 loan from BB&T for their personal benefit--for using Naranjito's assets and profits for personal gain.

Count V is a breach of contract claim against defendants Renal Physicians and PPG. The MSA required Renal Physicians and PPG to provide certain business and administrative management services to Naranjito. Plaintiffs alleged that SNG breached the MSA by, among other things, failing to provide the services Renal

4

Physicians and PPG were responsible for, and for allowing Renal Physicians and PPG to overbill Naranjito for their services for the period after ASPR took over the commercial billing and collections.

Count VI is a civil RICO count against Ponniah Sankar and SNG based on their conduct in obtaining the lending arrangement with BB&T to fraudulently acquire an equity interest in Naranjito, as previously mentioned, and other SNG dialysis clinics, and to fund the operation of the clinics in a manner that diverted profits away from Naranjito and other clinics for the benefit of the Sankars, SNG, and other Sankar-affiliated businesses, to the damage of ASPR.

Count VII again is described as a civil RICO count against Ponniah Sankar and SNG, this one based on their conduct and activities in acquiring and maintaining a controlling interest in what was known as "SNG Dialysis Clinics," including Naranjito. This allegation appears again to be related to the acquisition by Ponniah Sankar and SNG of the $3,700,000 loan from BB&T previously mentioned.

Count VIII is another civil RICO claim against Ponniah Sankar and SNG, this time based on the relationship between those defendants and SNG Dialysis, again growing out of the transaction that resulted in the $3,700,000 BB&T loan as well as other

allegedly unlawful loans, and related transactions, that were made or conducted despite having never obtained ASPR's approval for the loans, the proceeds of none of which were used to benefit ASPR or Naranjito, but were for the sole benefit and personal use of Ponniah Sankar and SNG.

Count IX alleged against all defendants a conspiracy to violate civil RICO. This count alleged that defendants Bala Sankar, Renal Physicians, and PPG joined with Ponniah Sankar and SNG in a conspiracy to commit acts in violation of 18 U.S.C. § 1962(a)-(c). The respects in which that happened appear to be the same conduct previously alleged against the parties in the earlier civil RICO counts.

Count X is an unjust enrichment count against BB&T and SNG related to the funds received from the sale of Naranjito. This count essentially restates in different words the same complaints made by plaintiffs relative to alleged inappropriate disbursement of the $7 million received from Fresenius when it purchased Naranjito's assets.

Count XI is a fraud count against Ponniah Sankar and SNG related to the obtaining from BB&T of the previously discussed $3,700,000 loan that was used by SNG to purchase an interest in the assets of Naranjito.

Count XII is a civil conspiracy claim against all defendants. At the outset of allegations under this count, the allegation is made that "[t]his is an action for damages arising from a civil conspiracy by the Defendants to defraud ASPR through Defendants' acts of promoting and perpetuating Ponniah Sankar's and SNG's self-dealing and disloyalty." Doc. 36 at 57, ¶ 270.

Count XIII is a conversion count against BB&T and SNG. Plaintiffs describe this count as "an action for damages arising from SNG's and BB&T's conversion of property rightfully owned by ASPR as minority owner of Naranjito." Id. at 58, ¶ 276. The complaint in this count relates to the handling by BB&T and SNG of the proceeds from the $7 million sale of the assets of Naranjito to Fresenius.

Count XIV is an equitable accounting claim against SNG by which ASPR seeks an accounting of the financing of Naranjito due to SNG's fraudulent activities and corporate misconduct orchestrated by its controlling member, Ponniah Sankar, as described in the amended complaint. Id. at 59, ¶ 283.

Count XV asserted a breach of duty of good faith and fair dealing claim against BB&T. It is based on allegations that BB&T owed Naranjito a duty of good faith and fair dealing in connection with the financial services provided to Naranjito, and

7

that BB&T violated that duty as to various transactions that are described in the amended complaint. Id. at 60, ¶¶ 287-288.

Count XVI asserts an aiding and abetting breach of fiduciary duty claim against BB&T. This count is based on an allegation that BB&T aided and abetted the Sankars and SNG in their violations of fiduciary duties owed to ASPR and Naranjito. Id. at 61, ¶¶ 291-292. Those alleged breaches of fiduciary duty apparently pertain to various transactions that were earlier described in the amended complaint.

Count XVII alleged violation of the Texas Deceptive Trade Practices Act against BB&T. Plaintiffs alleged that ASPR and Naranjito were consumers within the meaning of the Texas Deceptive Trade Practices-Consumer Protection Act and that the bank engaged in false, misleading, and deceptive acts, practices, and/or omissions with respect to the provision of financial services to Naranjito and ASPR, again referring to the various transactions in which BB&T were involved that previously had been described in the amended complaint. Id. at 61-62, ¶¶ 295-296.

II.

## Mentions in the Amended Complaint of Cantey Hanger and Its Attorneys

There was no mention of Cantey Hanger or any of the Cantey Hanger attorneys in the original complaint by which this action was initiated in November 2018. Doc. 1. As what might be viewed

to be a prelude to the late decision of the plaintiffs to seek disqualification of Cantey Hanger and its attorneys from representing any defendant in this action, plaintiffs mentioned in the amended complaint fourteen times the involvement of Cantey Hanger and its attorneys in various transactions about which plaintiff complains.

Those mentions include the following allegations:

(1) Naranjito hired Cantey Hanger to assist in the sale of Naranjito to Fresenius, and throughout the transaction lawyers from Cantey Hanger were in contact with Rivera regarding various aspects of the transaction and its impacts on Naranjito and Naranjito's members. Doc. 36 at 26, ¶¶ 102-03.

(2) Plaintiffs alleged that at no time during that transaction did Cantey Hanger, ostensibly representing Naranjito, disclose to Naranjito's minority member, ASPR, the $3,700,000 loan that allegedly was improperly made by SNG, at the behest of the Sankars, despite the significant impact that the loan would have on ASPR's distribution from the sale. Id. at 26, ¶ 105.

(3) SNG used its relationship with Cantey Hanger to further marginalize ASPR to the benefit of SNG and the Sankars. Id. at 29, ¶ 123.

(4) Cantey Hanger, ostensibly Naranjito's attorneys, began to actively support attorneys litigating against ASPR and Rivera in Puerto Rico litigation, holding regular conference calls and passing along information obtained from ASPR and Rivera as part of Cantey Hanger's representation of Naranjito. Id.

(5) The Cantey Hanger attorneys represented SNG, and later the Sankars, in an arbitration proceeding between those parties before the American Health Lawyer's Association Dispute Resolution Service ("AHLA"). Id. at 30, ¶ 125.

(6) On behalf of SNG and the Sankars, Cantey Hanger began to "interface directly" with attorneys for Bio-Medical and BB&T regarding the claims of ASPR to a part of the sale proceeds, and "[t]ogether, the attorneys for Cantey Hanger, Bio-Medical, and BB&T united to cut ASPR out of the sale process, regularly communicating to coordinate a strategy designed to withhold information from ASPR and complete the sale regardless of its impact on ASPR." Id., ¶ 128.

(7) Cantey Hanger, while representing Naranjito in the sale to Fresenius, negotiated an indemnification agreement on behalf of SNG by which SNG agreed to indemnify the purchaser for any demands of litigation pending at the time

of the closing, and Cantey Hanger was the recipient of all notices and communication related to the indemnification agreement. Id., ¶ 129.

(8) The Sankars paid their attorneys at Cantey Hanger over $50,000 from accounts opened at BB&T for the benefit of San Miguel, without authorization from Rivera, even though Cantey Hanger has never done legal work for San Miguel. Id. at 34, ¶ 149.[3]

## III.

## Plaintiffs' Unusual Method of Raising Its Claim of Disqualification

The court first became aware of plaintiffs' contention that Cantey Hanger and its attorneys were disqualified from representing a defendant or defendants in this action by the receipt by the court on April 2, 2019, of a document titled "Plaintiffs' Motion for a Rule 16 Status Conference." Doc. 54. In that document, plaintiffs alleged that they learned for the first time, from document production discovery that was conducted in an arbitration demanded by SNG through the AHLA against ASPR and Rivera related to Naranjito, that attorneys with Cantey Hanger, who were representing Naranjito in the sale of

---

[3]San Miguel is the name of the company through which Rivera owned his interest in Naranjito. Doc. 36 at 6, ¶ 22.

Naranjito's assets to Fresenius, were the same Cantey Hanger attorneys (Brian Newby ("Newby"), Scott Fredricks, and David Speed ("Speed")) who were simultaneously representing SNG and the Sankars in matters directly adverse to ASPR and Rivera. As far as ASPR and Rivera were aware, the Cantey Hanger attorneys' representation was limited to representing Naranjito with respect to the asset sale to Fresenius, and they were surprised to learn that during that period those attorneys were actively assisting SNG with plans to remove ASPR from the joint venture and litigate claims against ASPR and Rivera in Puerto Rico state court proceedings. Neither Rivera nor ASPR had knowledge of that dual representation, nor did either of them consent to the conflict of interest the Cantey Hanger attorneys suffered by reason of their conduct. According to plaintiffs, the unauthorized dual representation provided by the Cantey Hanger attorneys violated Texas Disciplinary Rules of Professional Conduct in the following respects:

a. Rule 1.09 as the Cantey Hanger attorneys are likely to use Naranjito's confidential information to Naranjito's detriment in the instant lawsuit;

b. Rule 1.09 as the Cantey Hanger attorneys' prior representation of Naranjito is substantially related to the current lawsuit; and

c. Rule 1.12 as the Cantey Hanger attorneys failed to disclose their dual representation of Naranjito and SNG to ASPR or Rivera;

> d. Rule 3.08 as several of the Cantey Hanger
> attorneys will likely be called as witnesses in
> this matter to provide testimony to the detriment
> of SNG[.]

Id. at 3, ¶ 8.

The movants alleged that because of the conflict presented by Cantey Hanger's continued involvement in this lawsuit, the plaintiffs are required to move to disqualify both the individual attorneys and Cantey Hanger from representing any defendant in this lawsuit.

Plaintiffs requested the court to schedule a status conference to address the possible disqualification of Cantey Hanger, and to consider a request by Cantey Hanger that the billing invoices upon which plaintiffs relied in filing their motion were inadvertently produced as part of the arbitration document production, and should be returned.

On April 2, 2019, the court issued an order directing Cantey Hanger and the individual attorneys named in plaintiffs' motion to file a response to the contentions of plaintiffs that they should be disqualified from representing any defendant in this action, and the court gave them a deadline of April 16, 2019 for the filing of their response. Doc. 55.

## The Response of the Cantey Hanger Attorneys

The Cantey Hanger attorneys timely responded to the directive of the April 2 order by filing a document titled "Response of Cantey Hanger LLP, Brian Newby, Scott Fredricks, and David Speed to Claims of Disqualification," together with an accompanying appendix.  Docs. 59 & 60.

The beginning summary explained that the Cantey Hanger lawyers have been representing SNG in matters directly adverse to Rivera and ASPR since 2016, a fact known to Rivera since that date, and that since 2014 SNG has owned sixty percent of Naranjito.  The summary also contained mention of the fact that Cantey Hanger and plaintiffs' lead counsel have been representing the same clients, respectively, against each other in legal actions (in arbitration and this federal court) for more than two years, since February 2017.[4]

The summary includes representations that Rivera and ASPR have repeatedly been requested to provide evidence that confidential information was obtained from either of them during

---

[4]Plaintiffs filed an action in this court (Case No. 4:17-CV-230-A) on March 16, 2017, to compel the stay of an arbitration, which action was dismissed by stipulation of dismissal without prejudice in late-May 2017.  The parties then proceeded to arbitration, including having a third-party accounting performed.  The instant action was initiated by plaintiffs following a determination of arbitrability, and then the parties agreed to present all claims to this court rather than to have parallel proceedings in arbitration and this court.

any alleged former representation by the Cantey Hanger attorneys, and how ASPR or Rivera may have been mistaken or misled as to Cantey Hanger's role in the sale transaction. According to the summary, plaintiffs' counsel failed to provide any responsive information.

In the Factual Background section of the response, the Cantey Hanger attorneys provide the following history:

ASPR and Rivera, on the one hand, and SNG, on the other, became business partners in 2014 when SNG acquired a sixty percent interest in Naranjito and ASPR had a forty percent interest in Naranjito. Cantey Hanger did not represent any party to the transaction. That business relationship soured in early 2015 with disputes regarding the management of Naranjito. Those disputes led Rivera to seek potential buyers of Naranjito and the ultimate agreement of ASPR and SNG in February 2016 to sell Naranjito to Fresenius for $7 million. Cantey Hanger attorneys did not represent any party to those negotiations. In April 2016, Cantey Hanger was hired by SNG to advise it with regard to the contemplated sale of Naranjito to Fresenius; and, Cantey Hanger lawyers began communicating with Rivera, who was and remains the sole member of ASPR, about the transaction. A Cantey Hanger attorney, Julie Bergkamp ("Bergkamp"), reviewed and revised drafts of the Asset Purchase Agreement, which she

provided to her client, which were in turn passed onto Rivera. Rivera reviewed and revised those drafts, which he shared with Bergkamp.

In June 2016, more disputes arose between SNG and ASPR/Rivera, this time regarding financial discrepancies that SNG had identified concerning ASPR's collection of billings on behalf of Naranjito. On June 14, 2016, SNG and PPG scheduled a call with Rivera to discuss Naranjito financials, and they included Bergkamp on the call invitation. The next day Rivera responded asking why they wanted to discuss financials with "your attorney," and explained that "I can not have a meeting with SNG's attorneys." Doc. 59 at 4. Those disputes between SNG and ASPR/Rivera continued to heat up, and on July 8, 2016, Puerto Rico lawyers representing SNG sent Rivera a letter demanding that ASPR immediately deposit over $1.2 million of Naranjito's funds into the operational accounts of Naranjito. Copies of that demand letter went to SNG officials and its outside counsel, Bergkamp.

Notwithstanding that dispute between SNG and ASPR/Rivera, in July 2016, Bergkamp continued to work on the documents necessary to close the sale of Naranjito and continued to communicate with Rivera regarding information he was required to provide. Rivera repeated his understanding of Cantey Hanger's representation of

SNG by confirming by email to Bergkamp that he would provide the comments "to your client." Id.

In August 2016, once it appeared that the transaction would close soon, the parties began executing the transaction documents, and on August 11, 2016, a representative of SNG emailed its signature page directly to the buyer's counsel, and copied SNG's counsel as well as Rivera on that email. Rivera responded by asking buyer's counsel for a completed set of the documents, and buyer's counsel replied to Rivera that the buyer was waiting an opinion letter and schedules "from SNG's attorney." Id. at 5. The buyer refused to close until Cantey Hanger issued a legal opinion letter that the allegations in an employment case pending in Puerto Rico would not have an impact on the transaction. Local counsel that Rivera had hired to defend Naranjito in that case had not provided the documents to Cantey Hanger.

As the financial dispute between SNG and ASPR/Rivera escalated, SNG's Puerto Rico counsel again wrote Rivera and demanded that ASPR immediately deposit $500,000 into the operational account of Naranjito, and Bergkamp was copied on that letter, as were SNG officials. A few days later, Rivera emailed defendant Ponniah Sankar complaining that he did not have a complete copy of the Asset Purchase Agreement to review, and that

Bergkamp had not complied with a so-called "escrow agreement."
Id. Rivera copied Bergkamp on that email. Bergkamp responded by
asking to what agreement Rivera was referring. In the response,
she reminded Rivera of a demand letter he had received in late-
August 2016 from SNG's Puerto Rico counsel, and attached a copy
of that letter to her communication to Rivera. Rivera responded
that same day by emailing Ponniah Sankar again, apparently
answering Bergkamp's question, saying "I signed the signature
page without the document and escrowed it to your legal
representation." Id. at 6 (emphasis added). SNG's in-house
attorney responded to Rivera, and copied Bergkamp, referring to
her as "our outside counsel." Id.

On September 8, 2016, SNG filed an action in Puerto Rico
against Rivera and ASPR seeking a provisional remedy or
preliminary injunction under Puerto Rico law. Cantey Hanger did
not appear on that pleading, but did confer with SNG's Puerto
Rico counsel regarding the proceeding. The proceeding was
terminated by SNG's Puerto Rico counsel when Rivera could not be
located for service of process.

In November 2016, the sale of Naranjito to Fresenius still
had not closed due to a variety of business and regulatory
reasons, but was set to close before the end of the year. On
November 17, 2016, Mr. Diego Loinaz ("Loinaz"), who said he had

been retained by ASPR with regard to the sale of Naranjito to Fresenius, wrote Bergkamp and the lawyers representing Fresenius in regard to the proposed sale transaction, and he copied Rivera on that email.  That evening, Bergkamp responded to Loinaz confirming for him that she represented SNG in the transaction and identified for him SNG's in-house counsel and its chief operating officer.  The following morning, Loinaz responded to Bergkamp, confirming his understanding that SNG was Bergkamp's client, indeed threatening SNG and the Sankars with liability if her client were to take certain actions.  On November 21, 2016, Loinaz confirmed that Bergkamp was counsel to SNG in an email he wrote to lawyers representing Fresenius, saying, "[t]his email is sent with the acquiescence of Ms. Julie Bergkamp and Ms. Maria Anderson counsel for SNG" and that "the legal representations of SNG and ASPR are working together to provide you with a response in connection with facilitating the closing of the APA."  Id. at 7.

On December 22, 2016, the lawsuit against ASPR/Rivera was voluntarily dismissed without prejudice, and refiled as an arbitration proceeding with the AHLA.  Cantey Hanger attorneys Newby and Speed were counsel of record in that proceeding.

On December 31, 2016, the sale of Naranjito's assets to Fresenius closed.  As a condition of that closing, Bergkamp

issued an opinion letter as counsel for Naranjito with respect to the validity of Naranjito and SNG's corporate structure, that Naranjito had authority to conduct and own the business it was engaged in, and that there were only three lawsuits pending on that date against SNG, and one arbitration between SNG and ASPR/Rivera.

On February 21, 2017, Carlos Concepcion ("Concepcion") (lead counsel for the plaintiffs in the instant action) and Adrian Nunez, both then of the Jones Day firm, filed an appearance on behalf of ASPR and Rivera in the arbitration.

On March 16, 2017, ASPR filed a lawsuit against SNG in this court asserting claims for breach of contract and declaratory judgment, and simultaneously asked this court to stay the arbitration pending resolution of the lawsuit. Concepcion was lead counsel for ASPR in that proceeding. Cantey Hanger attorneys Newby and Speed represented SNG. On May 9, 2017, this court ordered that the case be stayed pending a determination of arbitrability, and on May 30, 2017, ASPR and SNG filed a stipulation of dismissal without prejudice, which led to an order of dismissal.

The arbitration progressed with the parties ultimately reaching agreement as to the claims and parties that were subject to arbitration and those that were not; and, on August 17, 2018,

the arbitrators entered a scheduling order setting the arbitration for final hearing on April 29, 2019.

On November 12, 2018, plaintiffs filed this lawsuit. The claims brought in this lawsuit were ones the parties had agreed were not subject to arbitration, although involving substantially the same factual allegations that were pending in the arbitration. The parties to the arbitration had signed an agreement to withdraw from the arbitration and submit any and all claims to this court. That led to the agreed joint order of dismissal that was presented to the arbitration panel, and signed on January 18, 2019.

On February 1, 2019, plaintiffs filed an amended complaint in this action and, on February 11, 2019, Cantey Hanger attorneys filed a motion to dismiss on behalf of SNG, PPG, and Renal Physicians, in response to which plaintiffs filed their Motion for a Rule 16 Status Conference, in which, as noted above, plaintiffs asserted for the first time grounds for disqualifying Cantey Hanger and the Cantey Hanger attorneys.

One of the grounds of the response by the Cantey Hanger attorneys to plaintiffs' disqualification contention was that plaintiffs had by reason of their inaction, considering the knowledge they long ago acquired of the factual basis of their asserted grounds for disqualification, waived any challenge to

21

the disqualification of the Cantey Hanger attorneys to appear in this action.

The Cantey Hanger attorneys responded under separate headings to each of the reasons given by plaintiffs in their Motion for a Rule 16 Status Conference for disqualification.

If the factual history presented, and the arguments made, in Cantey Hanger's April 16, 2019 response are accurate, Cantey Hanger and its lawyers have the best of the argument on the disqualification issue. The contents of the responsive document and its appendix serve to totally undermine the claim of plaintiffs in their Motion for a Rule 16 Status Conference that plaintiffs did not learn until the document production in the arbitration proceeding in October 2018 that the Cantey Hanger attorneys were representing SNG and the Sankars in matters directly adverse to ASPR and Rivera. Doc. 54 at 2, ¶ 4. Also, the Cantey Hanger presentations directly refute the assertion in the Motion for a Rule 16 Status Conference that "[a]s far as ASPR and Rivera were aware, the Cantey Hanger attorneys' representation was limited to representing Naranjito with respect to the asset sale to Fresenius." Id., ¶ 5.

As Cantey Hanger notes in its response, plaintiffs seem to have known since no later than April 2016 that attorneys with Cantey Hanger were representing SNG and the Sankars in matters

adverse to ASPR and Rivera. And, the presentations made by Cantey Hanger in the responsive documents suggest that there is no factual basis for disqualification of Cantey Hanger or any of its attorneys.

However, the court did not treat the April 2, 2019 Motion for a Rule 16 Status Conference as a motion for disqualification of Cantey Hanger and its attorneys. The court so stated in an order it issued April 23, 2019. Doc. 61. By that order, the court gave plaintiffs a deadline of April 30, 2019 for the filing of a motion for disqualification. They filed such a motion on April 30, 2019, supported by an appendix. Docs. 64 & 65. Cantey Hanger and its attorneys filed their response to the motion to disqualify on May 7, 2019, accompanied by an appendix. Docs. 67 & 68.

V.

## Plaintiffs' Motion to Disqualify
## Cantey Hanger Attorneys and Cantey Hanger

The motion to disqualify elaborates on the grounds of the reasons for disqualification given by plaintiffs in its Motion for a Rule 16 Status Conference, putting emphasis on plaintiffs' contention that Cantey Hanger lawyers represented Naranjito rather than SNG in the sale of Naranjito's assets to Fresenius and that plaintiffs were surprised in February 2019 to learn that

since 2016 Cantey Hanger attorneys had been representing SNG in legal actions adverse to plaintiffs. A substantial part of the text of the motion to disqualify is devoted to statements and arguments to the effect that Cantey Hanger attorneys inappropriately engaged in conduct against the interests of Rivera and ASPR during and after the year 2016, as distinguished from a discussion of reasons why the representation by those attorneys of SNG, Renal Physicians, and PPG in this action would be inappropriate.

VI.

## Response of Cantey Hanger and Its Attorneys to the Motion to Disqualify

On May 7, 2019, Cantey Hanger and its attorneys filed a response to plaintiffs' motion to disqualify, supported by an appendix. Docs. 67 & 68.

In the summary of the response, Cantey Hanger described the foundation of the legal grounds for disqualification asserted by plaintiffs in their motion, and pointed out the fallacies in each of them, explaining:

The legal grounds for disqualification set forth in Plaintiffs' Motion to Disqualify is founded upon two factual assertions:

(1) that Cantey Hanger lawyers *represented SNG Naranjito LLC* ("Naranjito") rather than Sankar Nephrology Group, LLC ("SNG") in the sale of Naranjito's assets to Fresenius; and,

24

       (2)    that Plaintiffs were surprised *in February 2019* to learn that Cantey Hanger attorneys have been representing SNG in legal actions adverse to Plaintiffs <u>since</u> <u>2016</u>.

    The first of these claims is not supported by objective evidence but mere subjective belief and inference. The second is contradicted by direct evidence and factual assertions in the Plaintiffs' own motion. This response will demonstrate that Cantey Hanger *did not* serve as so-called "deal counsel" to Naranjito in the Fresenius transaction but instead represented Naranjito for the limited purpose of preparing an opinion letter that Plaintiffs' admit was "nothing more than a simple list of the pending litigation involving Naranjito and its constituent members-a document that could have been prepared by any experienced attorney in less than an hour." This response will also demonstrate that the Plaintiffs (and their attorneys) have known that Cantey Hanger attorneys have been representing SNG (and others) in matters adverse to them *since 2016*. Indeed, Plaintiffs' Motion concedes that they (and their lead counsel in this case) have been litigating claims related to Naranjito against SNG (represented by Cantey Hanger attorneys) since *February 2017.* Cantey Hanger's relationship to the parties is not a new discovery. What is new, is Plaintiffs' claim that Cantey Hanger should be barred from continuing to represent SNG (and others) in the longstanding dispute between them.

Doc. 67 at 1-2 (footnotes omitted).

    The responsive arguments' and appendix' support for the statements made by the Cantey Hanger attorneys in their summary cause the court to be persuaded of the accuracy of the summary. As the attorneys for SNG, the Cantey Hanger attorneys would be expected to involve themselves significantly on behalf of their client in matters pertaining to the sale of Naranjito. The court

is not particularly impressed with the fact the billing records of Cantey Hanger frequently refer to matters pertaining to the sale of Naranjito as descriptive of work done on behalf of SNG, the sixty percent owner of Naranjito.

In the reply plaintiffs filed May 22, 2019, plaintiffs put emphasis on contents of Cantey Hanger's billing records showing that it performed work that had the appearance of being performed for Naranjito. Again, the problem defendants have with that argument is that as the attorneys for the sixty percent owner of Naranjito, the Cantey Hanger attorneys logically would be involved on behalf of SNG of doing work that would advance the interest of an enterprise in which Cantey Hanger's regular client had a majority ownership interest.

Plaintiffs have indicated from time to time in their disqualification filings that there is a potential that the Cantey Hanger attorneys will be in violation of Rule 3.08 (lawyer as witness) of the Texas Disciplinary Rules of Professional Conduct because of the conduct of the attorneys or knowledge acquired by the attorneys related to transactions about which plaintiffs are complaining in this action. However, plaintiffs have not provided specificity as to what knowledge a Cantey Hanger attorney has that would require him or her to be a witness in this action adverse to SNG or one of Cantey Hanger's other

clients. Rule 3.08 could present some problems if, in fact, one or more of the Cantey Hanger attorneys has knowledge that would require, or justify, the attorney or attorneys to be called, or to take the stand, to provide testimony at trial. Rule 3.08 seems to contemplate that the giving by a lawyer of testimony adverse to his client would not violate the Rule if the client consents after full disclosure. See Rule 3.08(b) & (c) & Comment. 3.

The court concludes that before the court rules on plaintiffs' motion to disqualify or the pending motions to dismiss, the court should complete the hearing that is now scheduled for June 12, 2019, so that each side will be afforded an opportunity to create an evidentiary record in support of its positions on the disqualification issues. Therefore, ruling on such motions shall be withheld until after the hearing has been completed.

SIGNED May 28, 2019.

JOHN McBRYDE
United States District Judge