

ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 2 7 2019

CLERK, **U.S. DISTRICT COURT**
By _____
Deputy

AMBULATORY SERVICES OF
PUERTO RICO, LLC and CARLOS R.
RIVERA, an individual,

    **Plaintiffs,**

    **v.**

SANKAR NEPHROLOGY GROUP, LLC;
PONNIAH SANKARAPANDIAN aka
PONNIAH SANKAR; BALAMURUGAN
P. SANKARAPANDIAN aka BALA
SANKAR; BRANCH BANKING AND
TRUST COMPANY; RENAL
PHYSICIANS OF NORTH TEXAS, LLC;
and PPG HEALTH, P.A.,

    **Defendants.**

Civil Action No. 4:18-CV-916-A

## SECOND AMENDED COMPLAINT

Plaintiffs Ambulatory Services of Puerto Rico, LLC ("ASPR") on its behalf and derivatively on behalf of SNG Naranjito, LLC ("Naranjito"), and Carlos R. Rivera (collectively, the "Plaintiffs") bring this action against Defendants Sankar Nephrology Group, LLC ("SNG"), Ponniah S. Sankarapandian ("Ponniah Sankar"), Balamurugan P. Sankarapandian ("Bala Sankar"), Branch Banking and Trust Company ("BB&T"), Renal Physicians of North Texas, LLC ("Renal Physicians") and PPG Health, P.A. ("PPG") (collectively, the "Defendants"), and allege as follows:

## INTRODUCTION

1.    This is an action for damages arising, in part, from violations of the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a)-(d). Ponniah Sankar and SNG, through a pattern of racketeering activities and in conspiracy with other Defendants,

fraudulently acquired a majority interest in over 18 dialysis clinics in Texas, Louisiana and Puerto Rico in connection with acquiring, establishing and conducting an enterprise of over 18 clinics in Texas, Louisiana, Oklahoma and Puerto Rico (the "RICO Enterprise" or "SNG Dialysis").

2.      To facilitate this fraudulent RICO scheme, Ponniah Sankar, his son Bala Sankar (collectively, the "Sankars") and SNG forged ties with BB&T in order to open accounts, move money, access credit, acquire unauthorized loans and impermissibly encumber the assets of the those clinics owned and operated by the Sankars and SNG (the "SNG Dialysis Clinics").

3.      The Sankars' also used their affiliated entities, Renal Physicians and PPG, to control operations and conceal corporate finances. In this manner, Defendants' conspiracy successfully siphoned corporate profits from the SNG Dialysis Clinics while deceiving their minority business partners, such as ASPR, for personal gain. This structure is the operational core of the SNG Dialysis RICO Enterprise. A diagram illustrating this structure is attached hereto as **Exhibit 1**.[1,2]

4.      In 2014, as part of the RICO Enterprise and the Sankars' fraudulent practices, as further alleged herein, Ponniah Sankar and SNG orchestrated—and concealed from ASPR and

---

[1] Pursuant to this Court's Form Status Report Order, all exhibits to this Amended Complaint are contained within a separately submitted appendix. Accordingly, citations to these exhibits provide paralell cites to the individual exhibit and its page number within the Appendix, e.g. Ex. XX at XX (App. XX).

[2] Exhibit 1 (Appx. 0003-0005) depicts the pertinent transactions and events in this case. Page 2 (Appx. 002) diagrams the sale of San Miguel and subsequent establishment of Naranjito. Page 3 (Appx. 0004) diagrams Naranjito's operations through ASPR's and SNG's agreement to sell the clinic and subsequent closing and unauthorized transfer of sale proceeds to two BB&T accounts, which include a $2.72 Million payoff of SNG's loan obtained as part of the Fraudulent LBO. Page 4 (Appx. 0005) diagrams the RICO Enterprise and BB&T's facilitation of Ponniah Sankar's and SNG's fraudulent scheme with unauthorized financing arrangements, including Promissory Note 4 purportedly given by Naranjito to fund SNG's 60% interest. These events are further detailed in the Factual Allegations *infra*.

Carlos Rivera—a fraudulent leveraged buyout ("Fraudulent LBO") to acquire SNG's 60% joint venture interest in a dialysis clinic located in Naranjito, Puerto Rico, a part of the San Juan Metropolitan area.

5.      Critical to this scheme, Ponniah Sankar and SNG conspired with BB&T to have the joint venture secure a $3.7 Million secured loan that Ponniah Sankar and SNG used to purchase SNG's interest in the clinic. In addition to misrepresenting to ASPR and Rivera that the Naranjito clinic would be free and clear of loans and encumbrances, BB&T, Ponniah Sankar, and SNG prepared and executed all the loan documents in secret and actively concealed the loans' existence from ASPR throughout the joint venture.

6.      In order to cover-up this arrangement, BB&T sent loan statements and other correspondence directly to Ponniah Sankar or his affiliates Renal Physicians and PPG Health rather than to Naranjito—BB&T's nominal "customer." When combined with Renal Physicians' and PPG's concealment of Naranjito's finances, BB&T's diversion of account-related documents ensured that neither ASPR nor Carlos Rivera would discover the Fraudulent LBO.

7.      In addition to RICO violations, Defendants committed breaches of contract and other tortious acts to the detriment of ASPR's interest in Naranjito.

8.      As further alleged herein, Defendants' manipulation and corrupt practices have caused substantial harm to ASPR, Naranjito, and Carlos Rivera, as well as many other minority clinic owners who have similarly fallen victim to Defendants' unlawful actions across the United States.

## **PARTIES**

9.      ASPR is a limited liability company organized under the laws of the Commonwealth of Puerto Rico with its principle place of business in San Juan, Puerto Rico.

4812-7018-7419

ASPR's sole member and Co-Plaintiff, Carlos R. Rivera ("Carlos Rivera"), is a US citizen and resident of Puerto Rico.

10.     SNG is a limited liability company organized under the laws of Texas with its principle place of business in Fort Worth, Texas. SNG has twenty-five individual members, 22 of its members are citizens of Texas. Three are citizens of California.[3]

11.     Ponniah Sankar is a resident of Texas and a physician by trade, and direct or indirect owner of numerous dialysis clinics and other businesses in Texas, including SNG.

12.     Bala Sankar is a resident of Texas and a physician by trade, and direct or indirect owner of numerous dialysis clinics and other businesses in Texas. Bala Sankar is the son of Ponniah Sankar.

13.     Renal Physicians a limited liability company organized under the laws of Texas with its principle place of business in Irving, Texas. The sole member of Renal Physicians is Defendant PPG Health, P.A., itself a citizen of Texas for jurisdictional purposes.

14.     PPG Health is a professional association organized under the laws of Texas with its principle place of business in Fort Worth, Texas. Defendants Bala Sankar and Ponniah Sankar are members of PPG Health, along with Sridhar Allam, Saravanan Balamuthusamy; Imran Memon;

---

[3] Specifically, SNG members AASHRAI, Ltd.; Sridhar Allam; the Balamurugan Sankarapandian Trust; Bireddy, LLC; Frontier Nephrology PLLC; the Estate of Darrell Hirt; the Kalaivani Sankarapandian Trust; Lee Anderson FLP; Juliana Manalo; Kinam Martin; Mary Jo Godinich FLP; Ponniah Mohan; Murugan FLP; C.K.P. Nair; Peter Nguyen; Peter Ramirez; Pankajam Sankarapandian; Avinash Vallurupali; Kalaivani Duane; Sankarapandian FLP; and Defendant Bala Sankar are each citizens of Texas for jurisdictional purposes. Bart Dolmatch and Kim Dolmatch are citizens of California for jurisdictional purposes. As nearly all of the addresses belonging to these individuals and entities are to residences and not places of business, Plaintiffs omit them from this filing. Plaintiffs will provide a list of these addresses in a separate filing under seal if requested.

Peter Nguyen; Phuc Nguyen; and Peter Ramirez. Each of PPG Health's members are citizens of Texas for jurisdictional purposes.

15.     BB&T is a North Carolina banking corporation headquartered in Winston-Salem, North Carolina with over 1,900 financial centers in at least 15 states, including Texas.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(a) because the RICO claims (Counts VI, VII, and VIII) arise from a violation of 18 U.S.C. § 1961 *et seq.* This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to ASPR's RICO claims that they form part of the same case or controversy.

18.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

19.     Jurisdiction over this action is also proper pursuant to 12 U.S.C. § 632, because the case arises out of transactions involving international or foreign banking in a dependency or insular possession of the United States.

20.     This Court has personal jurisdiction over:

        (a)     SNG, a Texas limited liability company, which regularly transacts business in the district, and has its principle place of business in Fort Worth, Texas. Additionally, SNG's wrongful acts and breaches of contract were committed in Texas.

(b)     Renal Physicians, a Texas limited liability company, which regularly transacting business in the district, and committed wrongful acts and breaches of contract in Texas.

(c)     PPG, a Texas professional organization, which regularly transacts business in the district, and has its principle place of business in Fort Worth, Texas. Additionally, PPG's wrongful acts and breaches of contract were committed in Texas.

(d)     BB&T, which regularly transacts business in the district and throughout Texas with branches in 43 cities including 4 branches in Fort Worth, Texas; recruits Texas residents for employment in the state; and contracts with Texas residents in connection with their banking or financing business. Additionally, BB&T's wrongful acts were committed in Texas.

(e)     Ponniah Sankar and Bala Sankar, who are citizens and residents of Texas, controlling shareholders, officers, directors or managers of various Texas entities, including SNG, Renal Physicians and PPG, and regularly conduct business as medical doctors in Texas. Ponniah Sankar and Bala Sankar also committed tortious and other wrongful acts in Texas.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because all of the Defendants reside in the district, and (b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this district. Venue is also proper in this district pursuant to 18 U.S.C. § 1965 because Defendants reside, are found, or transact their affairs in this district.

4812-7018-7419

## FACTUAL ALLEGATIONS

22.     Carlos Rivera originally founded a hemodialysis clinic, *Centro de Dialisis San Miguel Arcangel* (the "Clinic"), on May 3, 2012, in Naranjito, Puerto Rico through a limited liability company bearing the same name ("San Miguel"). Exclusively through Rivera's efforts, San Miguel obtained all necessary authorizations from the Puerto Rico Department of Health and the Centers for Medicare & Medicaid Services to operate the Clinic, including securing a highly sought-after Certificate of Need ("CON").[4] Rivera also negotiated all health insurance provider contracts, hired staff, and fully equipped the Clinic.

23.     San Miguel successfully operated the Clinic, building rapport with its patient base and establishing itself as a premier hemodialysis facility in Puerto Rico.

### The Naranjito Joint Venture

24.     Due to the Clinic's success, Rivera planned to duplicate his clinic model in the city of San Juan, Puerto Rico. To do so, Rivera sought an investor to provide fresh capital for the development of a future facility. His inquiries led him to Ponniah Sankar and SNG, which owned and operated the SNG Dialysis Clinics in Texas, Louisiana and Oklahoma.

25.     Ponniah Sankar expressed an interest in investing in the new San Juan clinic. Ponniah Sankar touted to Rivera the success of his SNG Dialysis network and how San Miguel's clinic would flourish under his leadership.

---

[4] The CON is a state-issued certification required to open and operate a healthcare facility in Puerto Rico. The CON is only issued after completion of a comprehensive regulatory process that evaluates the actual need of a particular healthcare facility, including a hemodialysis facility, in a particular geographic area. Accordingly, the Puerto Rico Department of Health grants CONs on a limited basis and such certifications are a valuable asset to the holder.

7

26.     Between June 21, 2015 and July 17, 2015, Rivera had a number of conversations with Ponniah Sankar and/or his representative and agent, Ivan Ramirez. On multiple occasions, each represented and confirmed that Ponniah Sankar and his business, SNG, had the financial capacity to fund the contemplated acquisition without any third-party lending or leveraging of the Clinic's assets.

27.     Ponniah Sankar conditioned his involvement with first having an ownership interest in the Clinic.

28.     In early 2014, Carlos Rivera agreed to sell a 60% interest in the San Miguel clinic based on the representations made by Ponniah Sankar regarding his prior experience, future profitability of the joint venture, and financial capability to complete the transaction without outside funding.

29.     Consequently, Rivera and Ponniah Sankar, along with other SNG representatives, negotiated a partial sale of the Clinic's assets to SNG as part of a joint venture, which they named *SNG Naranjito* ("Naranjito" or the "Joint Venture"). The resulting sale of 60% of San Miguel's assets to SNG was memorialized in the San Miguel Asset Purchase Agreement (the "San Miguel APA"), attached hereto as **Exhibit 2** (Appx. 0006 - 0034).

30.     A number of contracts and agreements governed SNG and ASPR's Joint Venture, as described more fully below. From Naranjito's inception and throughout the life of the Joint Venture, SNG and the Sankars failed to abide by their obligations under these agreements.

31.     On July 1, 2014, SNG, San Miguel, and Rivera executed a Pre-Purchase Agreement memorializing the parties' agreement and providing for certain deliverables and other conditions for closing. On August 1, 2014, SNG, San Miguel and Rivera executed an Asset Purchase Agreement whereby Rivera, through San Miguel, sold 60% of the Clinic's business assets for the

8

sum of $3,720,000 to SNG. Rivera retained the remaining 40% interest, which he subsequently transferred to ASPR.

32.    Concurrently, ASPR and SNG executed a Membership Contribution Agreement ("MCA"), attached hereto as **Exhibit 3** (Appx. 0035 - 0040), and contributed their respective undivided interests in the Clinic's business assets ("Contributed Assets") to Naranjito. ASPR and SNG also executed other agreements in connection with the sale including a Limited Liability Operating Agreement for Naranjito (the "Operating Agreement"), attached hereto as **Exhibit 4** (Appx. 0041 – 0089), which governed the operations of the new joint venture.

33.    The Operating Agreement deemed SNG to have provided 60% of the Contributed Assets (including cash) to the business assets of Naranjito. This translated to a 60% membership percentage in the new joint venture. ASPR's share of Contributed Assets was set at 40%, with a corresponding 40% membership percentage. ASPR maintained its membership in Naranjito throughout the life of the Joint Venture, including at all times relevant to the claims asserted in this lawsuit.

34.    Pursuant to the MCA, the parties agreed that the Contributed Assets were at the time unencumbered of liabilities or obligations personal to either SNG or ASPR and unrelated to the business of the Clinic. Specifically, Section 2 of the MCA provides:

> Notwithstanding any provision of this Agreement to the contrary, [Naranjito] is **not assuming in conjunction herewith any other liabilities and obligations, including, without limitation, all liabilities and obligations associated with any activities conducted by the Members** [ASPR and SNG], jointly or severally, other than with respect to the Contributed Assets and their use for [Naranjito's] purposes.

*See* Ex. 3 at 2 (Appx. 37) (emphasis added).

35.     Following the dictates set forth in the MCA, the Operating Agreement expressly limited future financing and the encumbrance of Naranjito's assets. Section 6.7(a) of the Operating Agreement specifically dictates how financing may be authorized for Naranjito:

> [T]he Supermajority Approval of the Members is necessary for the authorization of any of the following acts . . . Borrow money and otherwise obtain credit and other financial accommodations in any amount other than short term, *unsecured* obligations incurred *in the ordinary course of business* of [Naranjito] or accounts payable.

*See* Ex. 4 at 24 (Appx. 0065).

36.     The Operating Agreement defines a "Supermajority of the Members" as "the consent, approval, or vote of the Members holding ninety percent (90%) of the total outstanding [shares] of Company at such time." *Id.* at 5 (Appx. 0046).

37.     Thus, pursuant to the membership percentages allocated under the Operating Agreement, neither SNG nor ASPR could borrow money or encumber the assets of Naranjito without the express authorization of the other party.

38.     Ponniah Sankar, through his controlling interest in SNG (the majority member of Naranjito), caused Naranjito to contract with Renal Physicians to serve as the Clinic's Manager, effective August 1, 2014. This engagement was memorialized through a Management Services Agreement ("MSA"), attached hereto as **Exhibit 5** (Appx. 0090 – 0103). Renal Physicians' CEO was Benny Manalo ("Manalo"), who also served as an executive of SNG. The MSA provides for a 5% management fee to Renal Physicians for their services. *See* Ex. 5 at 2 (Appx. 0092).

39.     Thereafter, Naranjito commenced operations with SNG serving as the majority member and, through Renal Physicians, in control of the operations and finances of the Clinic.

4812-7018-7419

## SNG and the Sankars' Fraudulent LBO Scheme

40.     Despite Ponniah Sankar and SNG's contrary representations to Rivera and ASPR, neither Sankar nor SNG had the capital necessary to fund SNG's purchase of the Clinic's assets.

41.     In violation of both the MCA and Operating Agreement, SNG never invested capital of its own in the Joint Venture and rendered Naranjito—and in turn, ASPR—liable for SNG's debt.

42.     During the lead-up to Naranjito's formation, SNG and ASPR determined that the new Joint Venture would require various demand deposit accounts to process various deposits, payments, and other cash management functions related to the new business. On Ponniah Sankar's recommendation, ASPR agreed to open these accounts at BB&T. BB&T had no physical branches in Puerto Rico.

43.     As part of the account-opening process, BB&T required Naranjito to submit a number of documents related to the joint venture's formation, including the including the Certificate of Organization, Certificate of Formation of a Limited Liability Company, Operating Agreement, and several forms related to the lease of the Naranjito facilities. Naranjito submitted each of these documents as requested, and BB&T subsequently opened several demand deposit accounts for the benefit of Naranjito.

44.     Despite being a managing member of the Joint Venture (through ASPR), Rivera was not made a signatory to any of these accounts. BB&T frequently used this as an excuse to refuse to provide ASPR with any information related to Naranjito's accounts when requested. This allowed the Sankars, SNG, Renal Physicians, and later PPG Health to hide the various unauthorized capital distributions made from Naranjito to SNG for the benefit of SNG and the Sankars.

4812-7018-7419

45.     With Naranjito's operating bank accounts in place at BB&T, the Sankars and SNG surreptitiously conspired with BB&T to carry out the Fraudulent LBO scheme by:

(a)     obtaining a secured loan from BB&T in the principal amount of $3,700,000 (the "BB&T Loan") for purchase of SNG's 60% membership;

(b)     leveraging all of Naranjito's assets, including ASPR's Contributed Assets, and granting a lien in favor of BB&T; and

(c)     adding Naranjito as a co-obligor on the BB&T Loan.

46.     Neither Ponniah Sankar, SNG, or Renal Physicians ever informed Carlos Rivera of these obligations. Indeed, each of these business associates actively concealed any evidence of such obligations from Carlos Rivera and ASPR.

47.     On behalf of ASPR and SNG, Carlos Rivera and Ponniah Sankar, respectively, registered Naranjito with the Puerto Rico Department of State as of July 9, 2014. Pursuant to this registration, SNG and ASPR agreed to set the closing of Naranjito's formational agreements on August 1, 2014.

48.     Thus, on August 1, 2014, ASPR and SNG executed the Operating Agreement, the MCA, the MSA, and the San Miguel APA. Pursuant to the San Miguel APA, SNG was to fund its purchase of 60% of San Miguel's assets with a payment of $3,720,000.00. SNG was to make this payment no later than August 1, 2014 in immediately available funds (less a $150,000 one-year escrow holdback as a contingency reserve for any potential San Miguel liabilities).

49.     Despite San Miguel performing all of its obligations under the San Miguel APA, SNG failed to deliver the purchase-price payment on August 1, 2014 as required. This is because, at that time, neither SNG nor the Sankars possessed the necessary capital to fund the purchase as agreed upon by the parties.

12

50.     Indeed, the Sankars could not fund this purchase until they became Naranjito's managers and could then assert the illusory and fraudulent authority to sign-off on the $3,7000,000 loan from BB&T.

51.     For this reason, on or before August 1, 2014, the Sankars, SNG, and BB&T (through Bill Dunn, BB&T Market President and Joshua Bustos, BB&T Vice-President and commercial lender supporting the Sankar relationship) agreed to build-in a four-day delay between the closing of Naranjito and the closing of the BB&T Loan.

52.     Neither ASPR nor Rivera agreed to permit SNG or the Sankars to fund the San Miguel asset purchase with a loan of any sort. Nor did they agree to permit SNG or the Sankars to execute a loan on behalf of Naranjito, whether to fund the San Miguel asset purchase or otherwise. Indeed, in order to prevent such a scenario, ASPR insisted on the supermajority anti-borrowing provision found in the Operating Agreement. Neither ASPR nor Rivera ever authorized the BB&T Loan.

53.     At no point did SNG, the Sankars, or BB&T inform either ASPR or Rivera (1) that Ponniah Sankar had agreed with BB&T to receive a $3,700,000 loan (the "BB&T Loan") purportedly on behalf of Naranjito—a company that had (at that time) no assets, employees, financial history, and had been formed less than one month prior; (2) that the proceeds of this loan would be used to fund the San Miguel asset purchase *solely for the benefit of SNG and the Sankars*; or (3) that Naranjito's assets would be encumbered in furtherance of this loan as a result of a lien placed by BB&T. Nor did SNG, the Sankars, or BB&T inform ASPR or Rivera that the BB&T Loan would close on August 5, 2014. The liability associated with BB&T Loan never appeared on any of Naranjito's records provided to ASPR by SNG, Renal Physicians, or PPG Health.

54.     Following the "closing" of Naranjito's formational documents, the Sankars and SNG were able to execute the unauthorized BB&T Loan documents, close on the BB&T Loan, and use the loan proceeds to buy into Naranjito as of August 5, 2014,. Unbeknownst to ASPR or Rivera, the Sankars did just that.

55.     Knowing that the BB&T Loan must be kept secret from Rivera for the scheme to work, BB&T also provided the Sankars, SNG, and Renal Physicians with access to BB&T's CashManager Online, a commercial cash management platform that permitted commercial entities with dissimilar ownership to link bank accounts and transfer funds between such accounts. Rivera was never given access to CashManager Online, nor was he informed that Naranjito's bank accounts had been linked to SNG and other SNG Dialysis Clinics' bank accounts through the system. SNG, Renal Physicians, and PPG Health were thus able to transfer funds from Naranjito to SNG for payment on the BB&T Loan without Rivera's knowledge, which they did multiple times per month for the life of the Joint Venture.

56.     Ponniah Sankar and Bala Sankar, through Naranjito, also executed a Security Agreement purportedly granting a lien in favor BB&T over Naranjito's personal property, including the Contributed Assets.

57.     On August 14, 2014, BB&T filed with the Department of State of Puerto Rico a UCC-1PR Financing Statement ("UCC-1") regarding its alleged lien on the personal property of Naranjito.

58.     The Loan Documents signed by Ponniah Sankar and Bala Sankar were witnessed by Carmen Gutierrez ("Gutierrez"), the Executive Administrator for Renal Physicians.

59.     In addition to the agreement between BB&T, the Sankars, SNG, and Renal Physicians to hide the BB&T Loan from Rivera, these parties further agreed at that time to actively

hide the fraudulent nature of the transaction by attempting to "paper" the transaction with a one-page, untitled document (the "BB&T Certification") purporting to give Ponniah Sankar the authority to borrow funds on behalf of Naranjito in direct conflict with the supermajority requirement of the Operating Agreement. At no point in time was the BB&T Certification represented as a loan document, nor, by its terms, does it reference or specifically authorize the BB&T Loan. The nebulous nature of this document was intentional, for without it BB&T would have no way to fulfill the conditions attached to its lending relationship with the Sankars and SNG.

60.     Indeed, the BB&T Certification was presented to Rivera in such a way so as to hide the true purpose of this document. Between July 22, 2014 and August 21, 2014, Gutierrez and Manalo exchanged numerous emails with Rivera regarding those items to be completed for closing. For example, on July 22, 2014, Gutierrez sent Rivera a checklist of the documents still required for closing. This checklist contained a number of documents, including "Certification of Company Resolutions" for both SNG and San Miguel and a "Lease Assignment" related to the Naranjito clinic's physical location required by BB&T. The BB&T Certification does not appear on this checklist and had never been discussed with Rivera by any party to the closing.

61.     On July 25, 2014, Gutierrez transmitted the BB&T Certification to Rivera by e-mail for his execution. Rivera received this email in the midst of multiple email correspondences related to closing the formation of Naranjito, including the Certification of Company Resolutions, corporate formational documents, and execution of the Lease Assignment. The file containing the BB&T Certification was titled "Puerto Rico Resolution," and the body of the email states only, "Carlos, Can you please sign and scan back to me."

62.     Given the ongoing back-and-forth at this time, Rivera believed that the BB&T Certification related to either the opening of Naranjito's operating account at BB&T or the Lease

15

Assignment required by BB&T. No borrowing of any sort had been discussed with Rivera. At the time Rivera received the BB&T Certification, he was in discussions with Renal Physicians regarding the urgency of opening bank accounts in order to process Naranjito's medical billing and allow for wire transfers from the insurers, such as Medicare, as payment for services rendered.

63.     At no point in time did Gutierrez, the Sankars, SNG, BB&T, or any other Renal Physicians' representative inform Rivera that the BB&T Certification was being obtained to evidence the members' authorization for the BB&T Loan. If they had, Rivera would have immediately suspended the Joint Venture closing.

64.     Upon information and belief, BB&T required a legal opinion from SNG regarding its authority to bind Naranjito without Rivera's consent, but, contrary to its own internal policies, BB&T subsequently accepted an affidavit from Ponniah Sankar and the BB&T Certification as sufficient authority for the BB&T Loan, despite the fact that BB&T was in possession of the Operating Agreement containing the anti-borrowing supermajority provision.

65.     SNG, Ponniah Sankar, and Bala Sankar never had the authority to sign the Loan Documents, nor grant a lien on all Contributed Assets. Their actions were, among other things, fraudulent and in furtherance of the larger RICO Enterprise.

66.     With the BB&T Loan proceeds in hand, SNG bought into Naranjito on August 5, 2014. At no point after the closing did the Sankars or SNG disclose to Rivera and ASPR that the proceeds were derived from the BB&T Loan or produce the Loan Documents binding Naranjito.

67.     Upon information and belief, SNG never disclosed the existence of the BB&T Loan in Naranjito's books and records, and always claimed as equity its full 60% capital contribution without any qualification.

16

68.     SNG, aided and abetted by BB&T and Renal Physicians, thus acquired its majority interest in Naranjito having invested no capital of its own in the transaction.

### BB&T's Ongoing Relationship with the Sankars and SNG

69.     BB&T has a long-standing banking and lending relationship with the Sankars and SNG going back to at least 2013. This relationship includes a substantial line of credit, the terms of which induce BB&T to ignore its own policies and procedures and encourage the Sankars to breach their fiduciary duties to each of the SNG Dialysis clinic's minority partners, including ASPR. Bill Dunn and Joshua Bustos formed the core of the BB&T team assigned to manage and grow the Sankar/SNG relationship.

70.     The SNG Dialysis clinics represent profit centers for a bank such as BB&T. Due to the nature of their business, these clinics maintain significant amounts of low-cost deposited funds; they have a high-volume of transactions—including checks, ACH transfers, and wire transfers—generating bank fees; the related nature of the Dialysis clinics through SNG and Sankar allowed for the sale of advanced cash management services generating substantial fee income for the bank; and the expansive nature of the SNG empire all but guaranteed a steady stream of new business for the bank officers assigned to the SNG relationship. Moreover, the lending relationship that the Sankars created between BB&T and the SNG Dialysis Clinics likely generated substantial amounts of interest and fee-based revenue for BB&T.

71.     Indeed, the lending relationship between the Sankars, SNG, and BB&T extends at least as far back as December 26, 2013, where BB&T issued a commercial loan to SNG. Under this lending relationship, BB&T has issued a $10 million Master Guidance Line of Credit to SNG (the "Acquisition Line") solely to support the Sankars' commercial acquisition ventures. Under the terms of the Acquisition Line, BB&T provided SNG with up to $10 million of borrowing

17

capacity to be used solely for the purchase of equity interest in dialysis centers and any related real

estate. BB&T issuance of this Acquisition Line marks the likely beginning of BB&T's agreement

with the Sankars and SNG to facilitate the improper diversion of capital from the various SNG

Dialysis Clinics through fraudulent means.

72.     The Acquisition Line provides for interest-only payments during the first twelve

months following a clinic's acquisition with monthly interest plus principal payments based on a

five-year amortizing note thereafter. These minimal initial payments allowed the Sankars and SNG

to hide the fraudulent transfers of capital out of the SNG Dialysis Clinics through the BB&T

CashManager platform.

73.     The Acquisition Line further requires the security of the outstanding balance

through a collateral interest in the equity of the purchased dialysis center and a joint and several

guaranty by each equity partnership in which SNG participates.

74.     Moreover, the terms of the Acquisition Line required the Sankars and SNG to

further violate the various asset-purchase agreements and operating agreements of these clinics by

permitting BB&T to take a collateral interest in the equity of the purchased dialysis centers and

requiring the guarantee of each such clinic, *regardless of whether such clinics' operating*

*agreements permitted it or the minority partners agreed to such an arrangement.*

75.     BB&T knew of and agreed to assist the Sankars and SNG with their fraudulent

LBOs as of the creation of the Acquisition Line.

76.     Flush with the cash provided by this Acquisition Line, Ponniah Sankar and SNG

have, since at least 2014 and continuing through today, taken out loans purportedly on behalf of

other SNG Dialysis Clinics without the consent of such clinics' minority shareholders, including

but not limited to SNG—Greenville Dialysis Center, LP; Bellaire Dialysis Group, LLC; St.

Tammany Dialysis Center; Abita Square Dialysis Center, and Naranjito. In each of these instances, BB&T agreed to underwrite the Sankars' loan without conducting the due diligence required by BB&T's own internal policies.

77.     As part of their fraudulent practices, the Sankars and BB&T encumber these clinics' assets without the approval of the clinics' minority partners and without BB&T conducting any of its required due diligence. Such clinics include, but are not limited to: SNG-St. Tammany Dialysis Center, LP; SNG-Seminole Dialysis Center, LP; SNG-Sandcastle Dialysis Center, LP; SNG-San Augustine Dialysis Center, LP; SNG-Renal Solutions Dialysis Center, LP; SNG-Northwest Dialysis Center, LP; SNG Hillcroft Dialysis Center, LP; and SNG-Abita Square Dialysis center, LP. As with the loans given to the Sankars, BB&T has agreed to accept the assets of the Sankars' loans without conducting the due diligence required by BB&T's own internal policies.

78.     In each of the lending relationships described above, Ponniah Sankar's actions to bind the SNG Dialysis clinics through guaranties given to BB&T were without consent of his minority business partners. In this manner, BB&T and the Sankars, along with their corporate instrument SNG, have forged a relationship whereby BB&T provides banking and financing services to the Sankars and SNG in exchange for loans and liens regardless of any obligations to receive written consent from their other partners or corporate resolutions from the SNG Dialysis clinics. There is, in each one of these relationships, an understanding between the Sankars and BB&T whereby the Sankars will be given term loans and/or lines of credit with little or no investigation on the part of BB&T in exchange for the Sankars' placement of the clinic's operating account with BB&T.

79.     Indeed, BB&T's agreement with the Sankars and SNG to refrain from exercising even basic levels of due diligence extended to the demand deposit accounts Ponniah Sankar opened

19

to support its fraudulent buyouts, as BB&T permitted Ponniah Sankar to open such accounts on behalf of commercial entities to which neither Sankar himself nor SNG had any relation. For example, BB&T (through Bill Dunn and Joshua Bustos) permitted Ponniah Sankar to open an account on behalf of San Miguel, despite Sankar not appearing anywhere on San Miguel's articles of incorporation, amendments thereto, or any San Miguel corporate resolution granting Sankar such authority.

80.     As to Naranjito, BB&T both ignored its own internal policies and procedures and failed to complete ordinary and required due diligence that would have shown that the Sankars and SNG lacked the authority, proper corporate resolutions, or other assurances from Naranjito that its members approved the BB&T Loan. Undoubtedly, BB&T's due diligence period on a $3.7 Million loan (or any loan for that matter) would have been longer than just 4 days. Indeed, BB&T was in possession of Naranjito's documents describing Naranjito's ownership and managers from the demand deposit account opening process forward. BB&T knew of the restriction on encumbrances set forth in Section 2 of the MCA and further limitations provided in Naranjito's Operating Agreement. BB&T ignored these requirements in exchange for the revenues promised by another SNG clinic relationship.

81.     Despite its own policies, procedures, and the documentation provided by Naranjito itself indicating that neither Ponniah Sankar nor SNG had unilateral authority to bind Naranjito to anything, BB&T never contacted ASPR, never sought documentation regarding a membership vote on the loan approval, nor otherwise made known to ASPR that Naranjito was seeking credit.

82.     In reality, and as part of BB&T and the Sankars' unlawful practices, there was no reason to give notice to ASPR or Rivera because the Acquisition Line was in fact personal to the Sankars and had nothing to do with Naranjito. BB&T knew this but still went forward with the

financing. Indeed, the loan was secured by the Sankars' family partnership, Sankarapandian Family Limited Partnership, an entity with no connection whatsoever with Naranjito. Similarly, another unrelated Sankar affiliate, TDC GP, LLC guarantied the BB&T Loan.

83.     Additionally, there were fifteen (15) SNG Dialysis clinics that guarantied the BB&T Loan that had no connection with Naranjito whatsoever. All entities signed through Ponniah Sankar only. *See, e.g.,* Guaranty Agreement dated August 5, 2014 at 3-5, attached hereto as **Exhibit 6** (Appx. 0104 – 0110). Such was the case because none of the clinics' minority owners were aware of the transaction. Later during Naranjito's operations, Ponniah Sankar similarly caused Naranjito to execute unauthorized guaranty obligations unrelated to Naranjito but, instead, for his and SNG's own benefit.

84.     Recognizing that the Sankars and SNG had no authority to encumber any of Naranjito's assets and that the Acquisition Line required collateral and guaranties that the Sankars and SNG had no authority to provide, BB&T took affirmative actions to conceal this account activity from Rivera and ASPR, including addressing Naranjito bank-related mailings to SNG, refusing to disclose account-related information to Rivera when requested, and discussing all Naranjito-related items with Ponniah Sankar or his representatives only.

85.     BB&T's actions to cover up its deceptive behaviors were not limited to the Sankars' Naranjito scheme. From time to time, an SNG minority partner would come across evidence of BB&T aiding in an impermissible leveraged buyout or improperly guaranteed SNG loans and would confront BB&T about its role in the scheme. Faced with the prospect of litigation that would reveal this conduct to regulators, investors, and the market at large, BB&T would withdraw the related UCC-1 financing statements and otherwise attempt to cover-up its participation.

86.     For example, the minority partners in SNG dialysis clinics St. Tammany and Abita Square discovered that the Sankars, through SNG, were using these clinics as collateral for a loan for an unrelated third-party dialysis clinic. When confronted with evidence of its role in facilitating the Sankars' scheme, BB&T released the minority owners from their purported obligations pursuant to the loan and withdrew the related financing statements.

87.     Upon discovering that fraudulent behavior had been committed with bank resources, any financial institution would have initiated its own investigation of the related circumstances to determine the scope of such a fraud, particularly where the customer maintained a significant banking relationship, including dozens of demand deposit accounts, a $10 million line of credit, and multiple promissory notes all related to the same line of business. At a minimum, such a financial institution would have contacted the other guarantors and minority partners on loans taken out by that customer to confirm that all of the purported commitments that had previously been made were legitimate. BB&T did no such thing.

88.     Instead, as described above, BB&T chose to silence the individuals that had discovered the scheme as quickly as possible in order to keep other impacted minority owners from discovering the ongoing improprieties committed by BB&T, the Sankars. And despite overwhelming evidence that something was amiss, BB&T conducted no investigation, performed no further due diligence, and contacted none of the Sankars' other business partners to question the validity of transactions and borrowing involving their respective joint ventures.

89.     In this fashion, BB&T, the Sankars, and SNG agreed-to and executed the Fraudulent LBO scheme. This was just the beginning of their fraudulent activities, however.

## Mismanagement of Naranjito's Operations

90.     Since its inception in August 2014, Naranjito's operations were controlled and managed by SNG and the Sankars from their offices in Texas and plagued with financial and managerial deficiencies.

91.     The Sankars unilaterally installed their affiliate, Renal Physicians, as Naranjito's administrator. At all times, however, the books, records, and operations were under the control of SNG and the Sankars.

92.     From the beginning of Naranjito's operations, Renal Physicians failed to adequately manage the day-to-day affairs of the Joint Venture. These deficiencies included, among others, failing to properly manage the staff, verifying patient eligibility for insurance coverage, timely and accurately submitting claims to the insurance carriers, and diligently follow up on denied claims and collections.

93.     ASPR also found significant errors and omissions in the accounting and billing reports raising significant concerns as to the Clinic's future financial viability. On countless occasions throughout 2015 into 2016, Rivera sought to have the errors corrected. He requested from SNG and Renal Physicians (and later PPG), billing compliance reports and Naranjito's financial and bank statements to evaluate Naranjito's financial condition. Although ASPR was a member entitled to the requested financials and reports, SNG and the Sankars withheld the information. And on the few occasions where SNG, Renal Physicians, PPG Health, or the Sankars did provide information requested by ASPR and Rivera, it was typically incomplete or inaccurate. For example:

> (a)     On March 30, 2015, Rivera reports to Manalo Renal Physicians' and SNG's failure to timely submit claims to secondary Medicare payors—an issue affecting

Naranjito's revenues. However, little was done by SNG or Renal Physicians to rectify the deficient billing practices.

(b)     On May 4, 2015, Rivera again brings to Manalo's attention, as well as Wayne Sparks of Renal Physicians, the potential losses due to ongoing, inadequate Medicare billing practices at Naranjito.

(c)     On June 3, 2015, Rivera again writes to Renal Physicians regarding his frustration with the billing/accounting practices, loss of revenue, and lack of an accounts receivable report or profit and loss statement for Naranjito. Regardless, the deficiencies continued.

(d)     On August 10, 2015, Rivera requests from Renal Physicians the Clinic's bank statements for 2015. None were received.

(e)     On August 10, 2015, Rivera also requests from Renal Physicians and SNG monthly reports consisting of Medicare accounts receivable, profit and loss statement, balance sheet and accounts payable. Although on August 14, 2015, Rivera is finally provided with a profit and loss statement by Renal Physicians, Rivera was astounded to find that certain monthly revenue figures were the same and estimated from month to month.

(f)     On August 18, 2015, Rivera writes to Ponniah Sankar and Manalo encouraging a change in the Clinic management due to repeated billing and accounting deficiencies. ASPR, with the agreement of Ponniah Sankar and Manalo, takes over the commercial billing in August 2015 in exchange for a 2.1% fee.

(g)     On September 2, 2015, Rivera writes to Ponniah Sankar and Manalo, among others, due the accounting department's failure to properly allocate the expenses

covered under Renal Physicians' management fee. Rivera reiterates his request for monthly financial statements, and inquires as to Renal Physicians' and SNG's failure to use Naranjito's bank account specifically opened in Texas for the Clinic. Indeed, Rivera later learns that Naranjito's Texas account is used as a pass-through only and SNG's own account is used to hold Naranjito's revenues.

(h)     On September 30, 2015, Rivera writes to Renal Physicians and SNG again requesting the Naranjito bank statements for 2015. No statements were produced.

(i)     On December 22, 2015, Rivera writes to Ponniah Sankar reiterating the ongoing collection issues with the Medicare secondary payors handled by Renal Physicians and SNG. Although Rivera requests an immediate resolution, issues with Medicare secondary payor claims persisted. Due to the Sankars' and SNG's refusal to share Naranjito's financial information, ASPR and Rivera were unaware of the extent of the accumulating losses to the Sankars' and SNG's mismanagement.

94.     In light of the foregoing continuous problems with the lack of transparency, claim collection efforts, and repeated billing errors, Rivera met with Sankar and Manalo at their Texas office in late-summer 2015 to address the uncollected accounts receivable. The Clinic generally had a very successful historical collections rate with little to no bad debt. At that meeting, Ponniah Sankar and Manalo agreed to recover any losses through Renal Physicians' and/or SNG's insurance policy and agreed to resubmit claims on the uncollected billings to eliminate Naranjito's purported bad debt.

95.     Since that meeting, ASPR has not received any further information regarding any insurance claims filed or proceeds received on uncollected accounts receivable.

4812-7018-7419

96.     A recent forensic accounting report issued by BDO USA, LLC ("BDO") identifies approximately $1.2 Million in lost revenue that either is improperly characterized as bad debt or simply remains unexplained by SNG. These monies were improperly diverted from Naranjito to SNG and the Sankars to the detriment of ASPR and Rivera.

97.     By early January 2016, ASPR no longer had confidence in Renal Physicians' ability to adequately serve as Naranjito's administrator. On January 19, 2016, Rivera issued a letter to Renal Physicians pursuant to the MSA's termination provision for material breach. Pursuant to this correspondence, Renal Physicians and Ponniah Sankar were given notice of the numerous deficiencies with the billing, finances, management, and operations of Naranjito. Rivera received no formal response to his letter.

98.     Several days after issuing this letter, Rivera discovered that Ponniah Sankar had unilaterally, and without any disclosure to ASPR, assigned and replaced Renal Physicians with another of the Sankars' affiliates, PPG, to serve as Naranjito's management company. This change was never authorized by ASPR or Naranjito.

99.     As with Renal Physicians, PPG also failed to properly maintain Naranjito's finances and provide the required transparency to ASPR.

100.    On March 28, 2016, Rivera, on behalf of ASPR, advised Ponniah Sankar and PPG that he was exercising his right as a member of Naranjito to audit its books and records. In response, PPG's CFO, Brad Schofield ("Schofield"), informed Rivera that SNG was holding an audit at the same time and, as such, Rivera would not be able to conduct an audit until after April 30, 2016. ASPR is never able to conduct its own audit.

101.    On May 19, 2016, Rivera again wrote to Ponniah Sankar informing him of deficiencies with PPG's accounting practices, particularly their failure to perform bank

26

reconciliations and maintain proper accounting practices. Neither Sankar nor PPG made any attempt to alleviate—or even address—Rivera's concerns.

102.    On July 20, 2016, Rivera requests detailed member capital statements from PPG. In response, PPG simply provides a short summary table with alleged figures from the equity accounts without any underlying data or justification. PPG never responds to requests to provide the additional detail requested.

103.    In the end, despite numerous written and oral requests to SNG, the Sankars, Renal Physicians, and PPG, ASPR was unable to obtain complete and accurate financials or bank statements for Naranjito, leaving it without any way to reconcile the books and operations of Naranjito.

104.    The failures of Renal Physicians, SNG, and PPG Health with respect to the overall management of Naranjito had the direct effect of lowering revenues, unnecessarily elevating bad debt, consuming profits for distribution and, as later learned, were intended to conceal the Sankars' and SNG's fraudulent practices and unpermitted personal extractions of Naranjito's capital.

<u>**Clinic Sale**</u>

105.    By the end of 2015, frustrated with the mounting deficiencies and lack of transparency, Rivera began courting potential buyers of the Clinic in an effort to maximize the return on ASPR's investment and benefit from the remaining good will and success of the Clinic.

106.    After engaging in negotiations with various potential buyers, Rivera secured a $7,000,000 offer ("Sales Offer") from Bio-Medical Applications of Puerto Rico, Inc. ("Bio-Medical"). Bio-Medical belongs to an international conglomerate operating under the name Fresenius Medical Care.

107.    On February 9, 2016, SNG and ASPR executed an Agreement to Sell Assets of SNG Naranjito, LLC to Fresenius Medical Care (the "Member Sale Agreement"), attached hereto as **Exhibit 7** (Appx. 0111 – 0112), setting forth the members' agreement to approve the Sales Offer. Importantly, the members agreed that the sale proceeds would be allocated pursuant to each members ownership interest, specifically:

| Members | % Ownership | Proceeds |
|---|---|---|
| Sankar Nephrology Group, LLC | 60% | $4,200,000.00 |
| Ambulatory Services of Puerto Rico, LLC | 40% | $2,800,000.00 |
| Renalium, LLC* | 0% | Any proceeds in excess of $7 million |

*Renalium, LLC is an entity wholly owned by Rivera that owned the Clinic's business assets prior to San Miguel commencing operations.

108.    SNG engaged the lawyers of Cantey Hanger, LLP to assist with this transaction. Despite Cantey Hanger's representation of SNG, Ponniah Sankar also unilaterally engaged the firm to prepare an opinion letter on behalf of Naranjito required by Fresenius to close the transaction. Despite this purportedly limited engagement, Naranjito paid tens of thousands of dollars in legal fees to Cantey Hanger for work actually performed on behalf of SNG and the Sankars. These improper distributions were never disclosed to ASPR or Rivera by PPG Health or SNG.

109.    On August 22, 2016, Naranjito and Bio-Medical executed an Asset Purchase Agreement (the "Bio-Medical APA") agreeing to the purchase and sale of substantially all of Naranjito's assets.

### Discovery of the BB&T Loan and the Fraudulent LBO Scheme

110.    On November 17, 2016—one month before the sale to Bio-Medical ultimately closed—ASPR finally discovered the BB&T Loan and related lien.

4812-7018-7419

111.    As part of its due diligence related to the Asset Purchase Agreement, Bio-Medical disclosed to ASPR a payoff letter drafted by BB&T to the Sankars and SNG. This letter revealed that over $2.7 million remained outstanding on the BB&T Loan and that BB&T had placed a related lien against Naranjito's property, including ASPR's Contributed Assets.

112.    This was ASPR's first notice that the BB&T Loan existed, that Ponniah Sankar and SNG had encumbered the assets of Naranjito in furtherance of the BB&T Loan, and that the Sankars had obtained their interest in Naranjito through the Fraudulent LBO scheme.

113.    ASPR also learned at this time that Ponniah Sankar unilaterally issued Naranjito guaranties to BB&T on other financing transactions wholly disconnected from Naranjito and the Clinic operations. None of these guaranties were authorized by ASPR.

114.    For example, on February 17, 2015, Ponniah Sankar, through SNG, issued a guaranty in favor of BB&T purportedly binding Naranjito, along with sixteen other SNG Dialysis Clinics. As with several other guaranties, Renal Physicians' Gutierrez served as SNG's witness.

115.    Similarly, pursuant to the Acquisition Line, BB&T granted Ponniah Sankar other loans further binding Naranjito to the detriment of ASPR. On February 17, 2016, Ponniah Sankar and SNG obtained a $3 million loan through a promissory note to BB&T, and in returned granted BB&T a security interest in the assets of Naranjito, along with sixteen other SNG Dialysis Clinics and other Ponniah Sankar-affiliated entities. PPG's Schofield witnessed that security agreement.

116.    Again, on July 20, 2016, Ponniah Sankar provided another guaranty agreement to BB&T purportedly binding the same SNG clinics, including Naranjito. Schofield witnessed this guarantee as well.

117.    Neither Ms. Gutierrez, Mr. Schofield, Renal Physicians, nor PPG disclosed these guarantees, and each took affirmative steps to conceal this information from ASPR and Rivera.

29

118.    SNG and Ponniah Sankar's actions to encumber Naranjito's assets were at all times unauthorized, for personal gain, and hidden from ASPR and Rivera.

119.    SNG and the Sankars' deception, self-dealing, and numerous *ultra vires* actions without any benefit to Rivera and ASPR were a breach their obligations under the Operating Agreement and the fiduciary duties each owed to Rivera and ASPR.

### ASPR and Rivera's Demand for Payment

120.    Upon learning of the BB&T payoff letter and the fraudulent activities conducted by the Sankars and SNG, ASPR immediately informed SNG, Bio-Medical, and BB&T that at no point had ASPR—and thus Naranjito under the Operating Agreement—authorized the BB&T Loan and lien on the Contributed Assets. ASPR also informed each that ASPR was entitled to receive 40% of the Bio-Medical sale proceeds.

121.    On several occasions, including November 17, 2016 and December 22, 2016, ASPR provided wire instructions to SNG and Bio-Medical in order to receive its $2.8 Million share of the sale proceeds. Such requests were ultimately ignored.

122.    For its part, SNG continued to deceive and defraud ASPR. SNG began a campaign to convince Bio-Medical that the BB&T Loan and lien were authorized by ASPR and, as such, the sale proceeds had to be paid to BB&T in order to satisfy the (unauthorized) BB&T Loan that encumbered the business assets.

123.    Rivera and ASPR later learned from BB&T's counsel that the BB&T Certification was not a document required for opening corporate bank accounts as Ponniah Sankar, SNG, and Renal Physicians previously represented, but instead to obtain the BB&T Loan. Specifically, BB&T informed Rivera and ASPR that BB&T intended to use the BB&T Certification as its controlling document that Naranjito granted authority to *any* of its managers, including Ponniah

Sankar and Bala Sankar, to secure a loan for Naranjito—regardless of the clear and express prohibitions contained within the MCA and Operating Agreement and the fraudulent nature in which Rivera's execution of the BB&T Certification was obtained.

124.     Neither ASPR nor Naranjito had ever provided to BB&T any corporate resolutions or other documents typically given to a bank as evidence of a company's authorization for financing. Indeed, the documents that had been provided to BB&T during the account opening process—the MCA and Operating Agreement—unambiguously required a supermajority approval of any loans.

125.     In an attempt to intimidate ASPR and Rivera from disrupting the sale to Bio-Medical by requiring SNG's compliance with its prior agreements, SNG filed suit against ASPR and Rivera in the Court of First Instance of the Judicial Center of Bayamon, Puerto Rico on December 7, 2016, alleging breaches of fiduciary duty, violations of Puerto Rico corporate laws and for unjust enrichment purportedly arising from Naranjito's Operating Agreement. *See generally* Complaint, Court of First Instance, Bayamon, Puerto Rico, Case No. DAC2016-2126.

126.     Continuing its intimidation tactics, SNG filed a separate action on September 8, 2016, and attempted to ouster Rivera after his repeated inquiries into the deficient operation of the Clinic and unanswered demands for financial information. *See generally* Complaint, Court of First Instance, Bayamon, Puerto Rico, Case No. DPE2016-0624.

127.     On December 22, 2016, SNG voluntarily dismissed its lawsuit and, on December 28 of that same year, filed a demand for Arbitration before the American Health Lawyer's Association Dispute Resolution Service raising similar claims in the matter styled *Sankar Nephrology Group, LLC v. Ambulatory Services of Puerto Rico, LLC and Carlos R. Rivera*, Claim No. 3794 (the "AHLA Arbitration").

31

128.    On January 18, 2019, the arbitration panel issued an Agreed Joint Order of Dismissal.

129.    Undeterred by SNG's attempts to dissuade ASPR from demanding its agreed-upon share of the sale proceeds, ASPR pressed forward with its demands to SNG, Bio-Medical, and BB&T.

130.    On behalf of SNG and the Sankars, the attorneys from Cantey Hanger began to interface directly with attorneys for Bio-Medical and BB&T regarding ASPR's claims. Together, the attorneys for Cantey Hanger, Bio-Medical, and BB&T united to cut ASPR out of the sale process, regularly communicating to coordinate a strategy designed to withhold information from ASPR and complete the sale regardless of its impact on ASPR.

131.    Without ASPR's knowledge, Bio-Medical and Naranjito closed on the sale on December 31, 2016.

132.    Despite ASPR's best efforts to prevent the Sankars and SNG from converting ASPR's share of the sale proceeds, on January 3, 2017, Bio-Medical, at the direction of the Sankars and SNG, processed two wire transfers totaling $7 Million to two (2) separate accounts at BB&T, as follows:

> (a)    $2,719,638.20 (the "Loan Payoff") to an account in the name of SNG and Naranjito to satisfy the BB&T Loan; and
>
> (b)    $4,280,361.80 to an account in the name of Naranjito.

133.    The wire transfers were unauthorized by ASPR and furthered the Sankars and SNG's scheme to nullify the value of ASPR's equity in Naranjito and use the sale proceeds for the own Sankars' personal gain. For its part, despite its knowledge of the fraudulent scheme and the Sankars' and SNG's respective fiduciary duties to ASPR, BB&T ignored ASPR and Rivera's

32

repeated attempts to prevent the Sankars and SNG's further fraud and breach of their fiduciary duties.

## RICO Enterprise and Racketeering Activities

134.    Only after uncovering the Fraudulent LBO scheme and further investigating the Sankars' and SNG's business affairs did ASPR discover the magnitude of the deceit and corruption ASPR and Rivera had experienced.

135.    While outwardly maintaining a consortium of hemodialysis clinics, Ponniah Sankar, SNG, Renal Physicians, PPG Health, and BB&T have, since at least 2014, actively worked together to defraud the Sankars' minority business partners out of both their equity stakes in and profit distributions from the SNG Dialysis clinics. This cooperation between SNG, Renal Physicians, PPG Health, and BB&T—under the direction of Ponniah Sankar—formed the heart of the defendants' RICO Enterprise.

136.    Over the years, Ponniah Sankar and SNG built the RICO Enterprise, comprising at least 18 joint ventures in hemodialysis clinics: SNG Naranjito, SNG-Texas City Dialysis Center, LP, SNG-St. Tammany Dialysis Center, LP, SNG-Seminole Dialysis Center, LP, SNG-Renal Solutions Dialysis Center, LP, SNG-Sandcastle Dialysis Center, LP, SNG-Northwest Dialysis Center, LP, SNG-San Augustine Dialysis Center, LP, SNG-Lufkin Dialysis Center, LP, SNG-Barlite/San Saba Dialysis Center, LP, SNG-League City Dialysis Center, LP, SNG-Abita Square Dialysis Center, LP, SNG-Hillcroft Dialysis Center, LP, Nacogdoches Dialysis Center, LP, SNG-Barlite Dialysis Center, LP, SNG-Greenville Dialysis Center, LP, and SNG-Bellaire Dialysis Center, LP.

137.    These clinics operate in several states and territories across the United States, providing care to patients with advanced chronic kidney disease.

33

138.    Yet, under Ponniah Sankar and SNG's majority control, the nominally independent SNG Dialysis Clinics also functioned as a single operating unit, funneling all revenues and expenses through SNG and allowing Ponniah Sankar to engage in self-dealing and further his illegal activities.

139.    Ponniah Sankar, individually and through SNG, informed the RICO Enterprise's participants of the goals and intent of this Enterprise, instructing each of the participants to use the instruments and skills possessed by each to accomplish these goals. Sankar selected the targets of his fraudulent behavior and, in return, the participants directed the activities within their zone of control so as to effectuate the goals of the Enterprise.

140.    For example, the financial operations and expansion of this RICO Enterprise were supported by the BB&T Acquisition Line and other financial services provided by BB&T. BB&T not only knew that Ponniah Sankar and SNG were acquiring the SNG dialysis clinics and guaranteeing the BB&T loans fraudulently, but BB&T endorsed this conduct through the terms of the Acquisition Line.

141.    To enable this scheme—and receive the substantial revenues associated with the SNG banking relationship—BB&T, through its Market President Bill Dunn, Vice-President Joshua Bustos, and others, agreed to ignore the due diligence requirements and other compliance measures applied to every other customer of the bank.

142.    Moreover, as of the date BB&T provided the Sankars and SNG with the Acquisition Line, BB&T agreed to provide the infrastructure through which the Sankars and SNG covered up the scheme. First BB&T ensured that information under its control related to the RICO Enterprise's activities—such as account statements, year-end tax forms, and loan repayment invoices—were

34

sent to either Ponniah Sankar directly or to his associates in Renal Physicians and PPG and never to the SNG dialysis clinics' minority business partners, including ASPR.

143.    Second, BB&T's CashManager Online permitted Renal Physicians, and later PPG Health, to hide SNG's improper distributions from the Joint Venture. By linking the BB&T bank accounts associated with each SNG Dialysis Clinic together with the accounts of SNG, the Sankars, SNG, Renal Physicians and PPG Health were able to fraudulent transfer funds from Naranjito's accounts to SNG. SNG then used these funds to pay down the BB&T Loan. This process was repeated over and over throughout the life of the Joint Venture. For example:

(a)    On October 17, 2014, Renal Physicians caused $36,130.12 to be transferred from Naranjito's bank account to an account controlled by SNG. On October 21, 2014, Renal Physicians caused $85.42 to be transferred from Naranjito's bank account to an account controlled by SNG. On October 31, 2014, Renal Physicians caused $36,608.74 to be transferred from Naranjito's bank account to an account controlled by SNG. SNG then used a portion of these funds to make an electronic payment of $7,653.04 toward the BB&T Loan on November 5, 2014.

(b)    On November 14, 2014, Renal Physicians caused $38,155.99 to be transferred from Naranjito's bank account to an account controlled by SNG. On November 26, 2014, Renal Physicians caused $35,993.11 to be transferred from Naranjito's bank account to an account controlled by SNG. SNG then used a portion of these funds to make an electronic payment of $7,416.98 toward the BB&T Loan on December 5, 2014.

(c)    On December 2, 2014, Renal Physicians caused $36,130.12 to be transferred from Naranjito's bank account to an account controlled by SNG. On

December 12, 2014, Renal Physicians caused $85.42 to be transferred from Naranjito's bank account to an account controlled by SNG. On December 24, 2014, Renal Physicians caused $36,608.74 to be transferred from Naranjito's bank account to an account controlled by SNG. SNG then used a portion of these funds to make an electronic payment of $7,668,97 toward the BB&T Loan on January 5, 2015.

(d)     On January 9, 2015, Renal Physicians caused $40,077.09 to be transferred from Naranjito's bank account to an account controlled by SNG. On January 23, 2015, Renal Physicians caused $38,828.92 to be transferred from Naranjito's bank account to an account controlled by SNG. SNG then used a portion of these funds to make an electronic payment of $7,714.21 toward the BB&T Loan on February 5, 2015.

(e)     On February 23, 2015, Renal Physicians caused $47,053.16 to be transferred from Naranjito's bank account to an account controlled by SNG. On February 26, 2015, Renal Physicians caused $4,107.76 to be transferred from Naranjito's bank account to an account controlled by SNG. SNG then used a portion of these funds to make an electronic payment of $6,967.10 toward the BB&T Loan on March 4, 2015.

(f)     On March 6, 2015, Renal Physicians caused $36,536.64 to be transferred from Naranjito's bank account to an account controlled by SNG. On March 20, 2015, Renal Physicians caused $35,917.29 to be transferred from Naranjito's bank account to an account controlled by SNG. SNG then used these funds to make an electronic payment of $7,717.61 toward the BB&T Loan on April 5, 2015.

4812-7018-7419

144.    This pattern continued until Fresenius acquired Naranjito's assets in January 2017. On information and belief, SNG improperly diverted over $200,000 from Naranjito's treasury— and thus from ASPR's equity and ultimate payoff upon the sale of Naranjito's assets—in this fashion. By the same token, BB&T improperly obtained these funds in interest payments and other fees as a result of SNG's payments.

145.    BB&T's actions contravened both its own internal policies and the generally accepted standards of the banking profession.

146.    For their part, Renal Physicians and PPG managed the SNG Dialysis operations. As Sankar-controlled entities, however, both management companies also knew of and agreed to participate in the RICO Enterprise as of their corporate formations.

147.    For example, Renal Physicians and PPG controlled the SNG Dialysis clinics' daily management and accounting. While each of the SNG Dialysis clinics had non-Sankar-related minority partners, Renal Physicians and PPG operated these clinics for the sole benefit of the Sankars. When necessary, Renal Physicians and PPG would alter or conceal financial records to mask the Sankars' self-dealing transactions. Indeed, both Renal Physicians and PPG failed to disclose loans, security agreements, loan guaranties, and other instruments directly affecting the equity interest of the SNG Dialysis minority partners, even when such minority partners would request access to the full financial and operations document collections of their respective clinic.

148.    Perhaps most egregiously, Renal Physicians and PPG actively facilitated the improper transfer of clinic profits to SNG and the Sankars, violating the respective clinics' operating agreement, the respective management company's master service agreement, and significant diminishing the distributions and retained earnings owed to the minority partners. Such was the case with Naranjito.

149.    Once Naranjito became an SNG affiliate, Ponniah Sankar injected Naranjito into the RICO Enterprise. Instead of having separate and strictly independent bank accounts and books and records, Ponniah Sankar and SNG improperly commingled Naranjito's clinic assets and operations with the other SNG Dialysis clinics with the assistance of Renal Physicians (later PPG) and BB&T. This had the impact of concealing Naranjito's finances from ASPR and Rivera and enabled Ponniah Sankar to utilize its operations and profits for personal benefit and gain.

150.    Indeed, as described above, all of Naranjito's finances were funneled through an SNG account serving as a clearinghouse for all of the SNG Dialysis Clinic's income and expenses. Rivera did not have access to these bank accounts and was unable to obtain information related to the activities therein from BB&T. This permitted SNG and Ponniah Sankar, in conspiracy with the other Defendants, to centrally manipulate and control all SNG Dialysis Clinic's finances, while preventing ASPR and Rivera from monitoring Naranjito's operations and financial expenditures.

151.    Through the RICO Enterprise, SNG and the Sankars used over $720,000 of Naranjito's income for personal expenses and the benefit of other unrelated Sankar-businesses. Indeed, this funneling out of clinic money for personal use is a hallmark of the Sankar scheme. Moreover, Ponniah and Bala Sankar were not the only beneficiaries. For example, the Sankars, through Renal Physicians and PPG, used their control over the SNG Dialysis Clinic's finances to pay exorbitant salaries to other Sankar family members for little or no actual clinic-related work.

152.    Similarly, the Sankars and SNG paid their attorneys at Cantey Hanger over $50,000 for work done on behalf of the Sankars and SNG from accounts opened at BB&T in the name of Naranjito and San Miguel.

153.    The Sankars and SNG deceived ASPR by eviscerating the value of its equity through unauthorized loans, security agreements, guaranties, and undisclosed profit distributions

disguised as loans or expenses. For example, just as with the other SNG Dialysis clinics, Ponniah

Sankar gave numerous unauthorized guaranties to BB&T securing obligations unrelated to

Naranjito and, upon information and belief, personal to him and SNG:

> (a)     On February 17, 2015, Ponniah Sankar, through SNG, issued a guaranty in
> favor of BB&T purportedly binding seventeen (17) SNG Dialysis clinics, including
> Naranjito, without any authorization from the minority partners. Gutierrez of Renal
> Physicians witnessed this guaranty.
>
> (b)     On February 17, 2016, Ponniah Sankar, through SNG, obtained a $3 Million
> loan through a fifth promissory note given to BB&T, and granted BB&T a security
> interest pledging the assets of the seventeen (17) SNG Dialysis clinics, including
> Naranjito, along with other Ponniah Sankar-affiliated entities. PPG's CFO,
> Schofield, witnessed the security agreement.
>
> (c)     On July 20, 2016, Ponniah Sankar, through SNG, issued another guaranty
> agreement to BB&T purportedly binding the same seventeen (17) SNG Dialysis
> clinics without authorization. Schofield witnessed this guaranty as well.

154.    Neither ASPR nor Naranjito approved these transactions.

155.    Instead, the Sankars and SNG conspired with BB&T to obtain the various BB&T

loans through numerous *ultra vires* actions in the name of the SNG Dialysis clinics without any

benefit to the clinics or the clinics' minority partners.

156.    The Sankars and SNG, both individually and through Renal Physicians and PPG,

used the wires when transferring the loan proceeds from BB&T and when paying down the loans

owed to BB&T through BB&T's CashManager Online system. The Sankars, through their

affiliates, also had accounts at First Citizens Bank and used the wires to transfer monies to BB&T in furtherance of their unlawful activities.

157.    Through the Acquisition Line and corporate documents BB&T received when opening Naranjito's accounts, BB&T knew that these loans and the monies processed through these wire transfers were fraudulently obtained.

158.    Similarly, as described above, SNG, through Renal Physicians and PPG Health, used the wires to divert insurance reimbursements to the SNG-controlled bank accounts.

159.    The Sankars and SNG, in conspiracy with the other Defendants, also used the wires to electronically transmit false financial information covering up the existence of the BB&T Loan. For example:

(a)    On April 23, 2015, Rivera sent an email to SNG-employee Yan Ding requesting a copy of Naranjito's current profit-and-loss statement. Ding responds via email the same day with a spreadsheet containing Naranjito's revenues and expenses from August 2014 through December 2014. This spreadsheet does not include the interest payments made by Naranjito toward the BB&T Loan. SNG intentionally omitted these payments to prevent Rivera's discovery of the BB&T Loan.

(b)    On June 17, 2016, Rivera requests that Brad Schofield—CFO of PPG Health and SNG Dialysis—send the "2014, 2015, 2016 complete [P&L's] and balance sheets and 2016 general ledger on excel files." On June 20, 2016, Schofield responds with the requested documents. Neither the profit-and-loss statements, the balance sheets, nor the general ledger contain any reference to the BB&T Loan or its associated interest and fee expenses. On the direction of the Sankars and SNG,

40

PPG intentionally omitted this information to prevent Rivera's discovery of the BB&T Loan.

(c)     On February 6, 2017, Schofield again sends Rivera Naranjito's financial statements via email. As with his June 2016 email, neither the profit-and-loss statements, the balance sheets, nor the general ledger contain any reference to the BB&T Loan or its associated interest and fee expenses. On the direction of the Sankar and SNG, PPG intentionally omitted this information to obscure the true nature of the expenses incurred by Naranjito in relation to the BB&T Loan.

160.    ASPR and Naranjito have been substantially harmed by Defendants' unlawful practices and conspiracy to deplete all company proceeds and render ASPR's equity worthless.

161.    Unfortunately, this pattern of racketeering activity is not limited to Naranjito. Several other SNG minority partners have recently stepped forward in order to obtain the assistance of the judiciary in ending the Sankars' activities. *See* Order and Final Judgment Confirming Arbitration Awards, *Ramamurthy v. Sankar*, Cause No. 48-285587 (48th Judicial District Court in and for Tarrant County, Texas Sept. 21, 2018) (confirming arbitration award and entering final judgment in favor of the minority business partners and against Ponniah Sankar for improperly diverting funds from various SNG dialysis clinics managed by PPG). A true and correct copy of the Order and Final Judgment Confirming Arbitration Awards is attached hereto as **Exhibit 8** (Appx. 0113 – 0136); *see also* Plaintiff's Original Petition[s], *Marie De Guzman v. Sankar Nephrology Group, LLC,* Cause Nos 342-296311-17 and 153-296313-17 (48th Judicial District Court in and for Tarrant County, Texas November 14, 2017) (seeking more than $1 million in damages from SNG for its failure to pay for its minority share partnership interest in a Texas-

based dialysis clinic). A true and correct copy of the Original Petitions are attached hereto as **Exhibit 9** (Appx. 0137 – 0144).

162.    On information and belief, other claims arising from the Sankar SNG Dialysis Clinics and involving similar behavior have been filed in various Texas courts and the American Health Lawyers Association arbitration forum

<u>**BDO's Forensic Analysis**</u>

163.    By agreement of the parties, BDO performed a forensic analysis of Naranjito's operations and issued a report on January 9, 2018 titled "Report of Tracing and Analysis Performed by BDO USA LLP on Behalf of SNG Naranjito, LLC" (the "BDO Report").

164.    The BDO Report confirms the existence of SNG's and the Sankars' self-dealing, including improper expenditures, distributions, and commingling of assets, as well as mismanagement of Naranjito's operations.

165.    Specifically, BDO's tracing analysis found, among other things:

(a)    approximately $1.2 Million exists in unrecovered revenues not thoroughly explained by SNG;

(b)    unauthorized distributions of $226,613 largely for SNG's and the Sankars' legal expenses, but incredibly including $93,000 in sales commission owed by SNG in relation to its initial purchase of its 60% interest;

(c)    additional unauthorized distributions of $276,777 for expenses personal to SNG, including $140,393 in overpayments it made to itself (not Renal Physicians or PPG) for management fees;

(d)    Entry errors in Naranjito's books in the amount of $218,716 representing additional distributions to or for the benefit of SNG and the Sankars;

42

      (e)     $76,000 Bio-Medical paid in sales proceeds for then-existing inventory kept by SNG; and,

      (f)     confirmed the $2,719,638 payment to BB&T to pay off the BB&T Loan.

166.    ASPR continues to investigate the extent of SNG's, the Sankar's, Renal Physicians' and PPG's improprieties with respect to Naranjito's operations.

167.    However, as evidenced by the BDO Report, SNG and the Sankars funneled at least approximately $3.44 Million out of Naranjito for personal benefit and use, and another $1.2 Million remains unaccounted for due to mismanagement or further undisclosed self-dealing.

168.    Indeed, according to SNG and the Sankars, despite nearly three years of operations and a business Bio-Medical was willing to acquire for $7 Million, no operational profits exist for distribution to the members.

**COUNT ONE**
**BREACH OF CONTRACT – MEMBER CONTRIBUTION AGREEMENT**
**(AGAINST SNG)**

169.    ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 168 as if fully set forth herein.

170.    The MCA is a valid and binding contract between ASPR and SNG.

171.    At all times material, SNG engaged in wrongful acts contrary to the express provisions of the MCA. Specifically, SNG breached Section 2 of the MCA by encumbering the Contributed Assets with liabilities and obligations personal to SNG with no benefit to and to the detriment of the ASPR.

172.    SNG's breach of contract deprived ASPR of its benefit of the bargain, pecuniary interest in the Contributed Assets, and member equity interest.

173.    As a result of SNG's breach, ASPR has suffered actual damages.

WHEREFORE, ASPR requests judgment in its favor along with actual, compensatory and consequential damages, pre- and post-judgment interest, attorneys' fees and costs along with any other legal or equitable relief the Court deems just and proper.

**COUNT TWO**
**BREACH OF CONTRACT – OPERATING AGREEMENT**
**(AGAINST PONNIAH SANKAR, BALA SANKAR, AND SNG)**

174.    ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 168 as if fully set forth herein.

175.    The Operating Agreement is a valid and binding contract setting forth duties and obligations of Naranjito's members and managers, including those of SNG, Ponniah Sankar, and Bala Sankar.

176.    At all times material, SNG, Ponniah Sankar, and Bala Sankar engaged in wrongful acts contrary to the express provisions of the Operating Agreement in breach of such agreement.

177.    Specifically, SNG, Ponniah Sankar, and Bala Sankar breach the following sections of the Operating Agreement:

(a)    Section 4.3 – Causing over $3.44 Million in unauthorized distributions to SNG, the Sankars or for their benefit and without a proportional distribution to ASPR as minority member;

(b)    Section 6.6(a) – expending Naranjito's assets for personal gain without any benefit to Naranjito contrary to the managers' obligations;

(c)    Section 6.6(h) – failing to protect the interest of Naranjito in its assets and collect all amounts due Naranjito, including a $1.2 Million in accounted revenues, and commingling Naranjito's assets and accounts with those of SNG and other SNG Dialysis clinics without authorization;

44

(d) <u>Sections 6.7(a) and 7.2</u> – entering into the unauthorized BB&T Loan and encumbering all of Naranjito's assets without a supermajority vote of the members;

(e) <u>Section 6.7(e)</u> – unlawfully granting an economic benefit to SNG, its affiliates, and managers by paying expenses personal to SNG and the Sankars of over $3.44 Million; and

(f) <u>Section 7.7</u> – failing to grant ASPR access to Naranjito's books and records.

178. Through acts of deception, SNG, Ponniah Sankar, and Bala Sankar carried out the Leveraged Buyout Scheme and hid the BB&T Loan from Respondents by, among other things, failing to provide financial statements and full access to Naranjito's books and records. Their actions were intentional and done with malice to knowingly usurp ASPR's interest in its share of Naranjito's assets and profits.

179. SNG also failed to compensate ASPR for its 2.1% fee for assuming the billing obligations for commercial insurance patients.

180. As a result of SNG, Ponniah Sankar, and Bala Sankar's breach, ASPR has suffered damages.

WHEREFORE, ASPR requests judgment in its favor along with actual and compensatory damages, pre- and post-judgment interest, attorneys' fees and costs along with any other legal or equitable relief the Court deems just and proper.

## COUNT THREE
## BREACH OF CONTRACT – MEMBER SALE AGREEMENT
## (AGAINST SNG)

181. ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 168 as if fully set forth herein.

182.    The MSA is a valid and binding contract between ASPR and SNG. The Member Sale Agreement memorializes the parties' agreement to allocate the sale proceeds between SNG and ASPR according to their respective interests acquired through the MCA.

183.    The MSA includes no carve-outs, set-offs, reductions, or any other conditions that reduce ASPR's share of the sale proceeds.

184.    ASPR is entitled to receive no less than $2,800,000 from the sale to Bio-Medical. ASPR is also entitled to 40% of the $76,000 received for Naranjito's inventory.

185.    SNG breached the MSA by (a) hindering and preventing the payment of ASPR's share of the proceeds directly to it; (b) causing Bio-Medical, instead, to pay the proceeds to accounts at BB&T rendering the proceeds inaccessible to ASPR, and (c) failing to pay to ASPR its 40% share of the sale proceeds.

186.    As a result of SNG's breach, ASPR has suffered actual and compensatory damages in the amount of no less than $2,830,400.

WHEREFORE, ASPR requests judgment in its favor along with actual and compensatory damages, pre- and post-judgment interest, attorneys' fees and costs along with any other legal or equitable relief the Court deems just and proper.

## COUNT FOUR
## BREACH OF FIDUCIARY DUTY
## (AGAINST PONNIAH SANKAR, BALA SANKAR, AND SNG)

187.    ASPR and Carlos Rivera re-allege and incorporate by reference all of the allegations set forth in paragraphs 1 through 168 as if fully set forth herein.

188.    ASPR and Rivera placed trust and confidence in SNG, as majority member, and the Sankars, as Naranjito's managers, giving rise to fiduciary obligations, including a duty of loyalty and obligation to act in good faith and deal fairly with ASPR, Naranjito, and Rivera.

46

189.    SNG and the Sankars, individually and on each other's behalf, have breached their fiduciary duties by committing self-dealing using Naranjito's assets and profits for personal gain. SNG and the Sankars acted in bad faith and with disloyalty by engaging in the Leveraged Buyout Scheme knowing that ASPR's Contributed Assets would be immediately encumbered by the undisclosed BB&T Loans. SNG's and the Sankars' blatant self-dealing is exemplified by their demand to Bio-Medical that it pay off the BB&T Loan knowing full-well that the BB&T Loan was personal to them and contrary to their obligations to Respondents.

190.    Beyond the unilateral distribution of $2.72 million to pay off the BB&T Loan, SNG and the Sankars subsequently refused to make a proportional distribution to ASPR.

191.    Additionally, throughout the Naranjito joint venture, SNG and the Sankars failed to disclose the financial condition of Naranjito in order to prevent ASPR and Rivera from discovering the full nature of the self-dealing, including commingling of assets between Naranjito, SNG, and other non-related Sankar-controlled entities. SNG and the Sankars used their position of power as majority partner and control over Naranjito's operations and finances to divert monies as they saw fit for their own benefit, including at least $722,000 in personal expenses and benefits received at the expense and detriment of ASPR and Rivera's interests.

192.    SNG and the Sankars' acts and omissions were done knowingly, willingly, and with malice in order to deceive ASPR and Rivera and cause them financial harm.

193.    SNG and the Sankars' acts and omissions have, in fact, caused ASPR, Naranjito, and Rivera damages.

WHEREFORE, ASPR and Carlos Rivera request judgment in their favor along with actual, compensatory, consequential, and exemplary damages, pre- and post-judgment interest, attorneys' fees and costs along with any other legal or equitable relief the Court deems just and proper.

## COUNT FIVE
## BREACH OF CONTRACT – MANAGEMENT SERVICES AGREEMENT
## (AGAINST RENAL PHYSICIANS AND PPG)

194.   ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 168 as if fully set forth herein.

195.   The MSA is a valid and binding contract between Naranjito and Renal Physicians, and PPG as assignee.

196.   As the sole members of SNG Naranjito, SNG and ASPR were intended third-party beneficiaries of the Management Services Agreement.

197.   The MSA required Renal Physicians and PPG to provide comprehensive business and administrative management services of Naranjito's operations. Article 2 of the MSA sets forth the Defendants' obligations. Such obligations included managing and adequately facilitating Naranjito's medical billing, collections and related finances, managing Naranjito's business expenses, assuring compliance with state and federal guidelines and providing personnel administrative services.

198.   Renal Physicians and PPG were also responsible for conducting or engaging and supervising contractors to provide general accounting services. Additionally, they were responsible for procuring and supervising the preparation of all tax return and related financial services.

199.   SNG breached the MSA by, among other things, (a) failing to properly manage the medical billing and collections, (b) facilitating the deposits of Naranjito's revenues in SNG;s own bank accounts, (c) failing to procure the Puerto Rico and US federal income taxes for Naranjito for years 2015 forward, (d) failing to assure compliance with obligations of the Puerto Rico

Treasury Department; (e) and failing to timely pay bonuses and other required compensation under Puerto Rico law to Naranjito's personnel.

200.    Renal Physicians and PPG also failed to reduce their management fee and, as a result, overbilled Naranjito for their services for the period after ASPR took over the commercial billing and collections.

201.    As a result of Defendants' breach of the MSA, ASPR has suffered actual damages.

WHEREFORE, ASPR requests judgment in its favor along with actual, compensatory and consequential damages, pre- and post-judgment interest, and costs along with any other legal or equitable relief the Court deems just and proper.

### COUNT SIX
### CIVIL RICO, 18 U.S.C. § 1962(a)
### (AGAINST PONNIAH SANKAR AND SNG)

202.    ASPR re-alleges and incorporates by reference all of the allegations set forth in paragraphs 1 through 168 as if fully set forth herein.

203.    This is an action for damages pursuant to 18 U.S.C. § 1962(a).

204.    Each Defendant is a RICO person for within the meaning 18 U.S.C. § 1961(3).

205.    The group of SNG Dialysis Clinics constitutes an association-in-fact enterprise pursuant to 18 U.S.C. § 1961(4). SNG Dialysis advertises over the internet via its website, www.sngdialysis.com, targeting patients, physicians and partners in Texas, Louisiana, Oklahoma and Puerto Rico. SNG Dialysis also engages in, and their activities affect, interstate commerce.

206.    Ponniah Sankar and SNG engaged in a pattern of racketeering activities to obtain lending arrangements with BB&T and use such proceeds to (a) fraudulently acquire an equity interest in Naranjito and other SNG Dialysis Clinics and (b) operate the clinics in a manner that

diverted profits away from Naranjito and other clinics for the benefit of the Sankars, SNG and other Sankar-affiliated businesses.

207.    Through the Fraudulent LBO scheme, Ponniah Sankar and SNG defrauded ASPR in order to obtain millions in loan proceeds. Ponniah Sankar, through SNG, conspired with BB&T fraudulently misrepresenting the Sankars' authority to bind Naranjito and the other SNG Dialysis clinics into granting loans, security agreements and guaranties despite never obtaining a supermajority approval of the corresponding membership.

208.    At no point in time were the lending arrangements used to benefit ASPR or Naranjito and, instead, were for the sole benefit and personal use of Ponniah Sankar and SNG.

209.    The Sankars, SNG, Renal Physicians, PPG, and BB&T conspired in order to carry-out a pattern of racketeering activity in connection with acquiring, establishing, conducting and controlling the SNG Dialysis clinics, including but not limited to Naranjito.

210.    The pattern of racketeering activity is evidenced by numerous predicate acts committed by Ponniah Sankar and SNG, by continuously and repeatedly participating in a scheme which included multiple acts of wire fraud, 18 U.S.C. § 1343, through the electronic transfer of funds in payment of the BB&T Loan, insurance deposits, and the asset sale proceeds.

211.    In addition, the RICO Enterprise committed additional acts of wire fraud, 18 U.S.C. § 1343, by the transmission of doctored and otherwise fraudulent financial documents to ASPR and Rivera and between and among SNG, Renal Physicians, PPG, ASPR, and BB&T through electronic mail and related file transfers.

212.    Through these predicate acts, Ponniah Sankar and SNG derived income directly from Naranjito's and the other SNG Dialysis clinics' operations, and indirectly through the loan